## Commonwealth ex rel. Specter *v.* Freed, Appellant.

Argued November 21, 1966. Before BELL, C.J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*I. Finkelstein,* for appellant.

*Arlen Specter,* District Attorney, with him *Gordon Gelfond* and *Alan J. Davis,* Assistant District Attorneys, for appellee.

*Edward R. Becker,* with him *Charles W. Sweeney,* for Board of Magistrates, amicus curiae.

*Peter Hearn,* with him *Aaron D. Blumberg,* and *Pepper, Hamilton and Scheetz,* for Greater Philadelphia Movement and Chamber of Commerce of Greater Philadelphia, amici curiae.

*Ferdinand P. Schoettle, Jr.,* for Crime Commission of Philadelphia, Inc., amicus curiae.

OPINION BY MR. JUSTICE ROBERTS, March 14, 1967:

M. Phillip Freed, a magistrate of the City of Philadelphia, appeals from the order of the Court of Common Pleas of Philadelphia County requiring him to comply with a subpoena issued by Arlen Specter, District Attorney of Philadelphia. The subpoena was issued by the district attorney in the course of an investigation by his office into whether Philadelphia magistrates were violating certain state statutes, including those imposing criminal sanctions for failure to make proper entries in the dockets of magistrate's court.[1] Magistrate Freed was directed by the subpoena to appear in the office of the district attorney and to bring with him certain official magisterial records.

Simply stated, the position of Magistrate Freed is that he is not required to comply with the subpoena served upon him, because the district attorney is not empowered to issue subpoenae to magistrates.[2] The district attorney quite properly makes no claim that he is invested with such power by the explicit provision of any statute or by virtue of common law, see *Commonwealth ex rel. Margiotti v. Orsini,* 368 Pa. 259, 81 A. 2d 891 (1951); his sole contention is that §8-409

---

[1] Act of June 15, 1937, P. L. 1743, §§14, 43, as amended, Act of May 9, 1949, P. L. 1028, §14, 42 P.S. §§1114, 1144. Compare Act of June 3, 1919, P. L. 369, §1, as amended, Act of April 29, 1925, P. L. 352, §1, 16 P.S. §7741.

[2] Specific powers to subpoena witnesses and evidence in connection with investigations of private detectives are conferred upon district attorneys by the Act of August 21, 1953, P. L. 1273, §5, 22 P.S. §15.

of the Philadelphia Home Rule Charter invests him with the subpoena power.[3]

As the decided cases in this area suggest, the question of the effect of the adoption of the Philadelphia Home Rule Charter, related statutes and constitutional amendments on offices which, like that of district attorney, were not prior thereto associated with municipal government of Philadelphia, is fraught with difficulty and dissent.[4] Notwithstanding these problems we conclude that the order of the court below must be reversed. In essence, our conclusion arises from the view that the Philadelphia Home Rule Charter does

---

[3] "Every officer, department, board or commission authorized to hold hearings or conduct investigations shall have power to compel the attendance of witnesses and the production of documents and other evidence and for that purpose it may issue subpoenas requiring the attendance of persons and the production of documents and cause them to be served in any part of the City. If any witness shall refuse to testify as to any fact within his knowledge or to produce any documents within his possession or under his control, the facts relating to such refusal shall forthwith be reported to any one of the Courts of Common Pleas of Philadelphia County and all questions arising upon such refusal and also upon any new evidence not included in the report, which new evidence may be offered either in behalf of or against such witness, shall as promptly as possible be heard by such court. If the court shall determine that the testimony or document required of such witness is legally competent and ought to be given or produced by him, the court may make an order commanding such witness to testify or to produce documents or do both and if the witness shall thereafter refuse so to testify or so to produce documents in disobedience of such order of the court, the court may deal with the witness as in other cases."

[4] *Carrow v. Philadelphia*, 371 Pa. 255, 89 A. 2d 496 (1952) (6 join in majority opinion; 1 dissenting opinion); *Lennox v. Clark*, 372 Pa. 355, 93 A. 2d 834 (1953) (4 join in majority opinion; 2 separate concurring and dissenting opinions filed); *Commonwealth ex rel. Truscott v. Philadelphia*, 380 Pa. 367, 111 A. 2d 136 (1955) (3 join in majority opinion; 1 concurs; 3 dissent); *Schultz v. Philadelphia*, 385 Pa. 79, 122 A. 2d 279 (1956) (3 join in majority opinion; 1 concurs in result; 2 file separate dissenting opinions).

not affect the manner in which the district attorney shall discharge the functions and duties of his office; we have arrived at this view because we believe that neither the Constitution nor the statutes of this Commonwealth have ever granted Philadelphia or any other political subdivision of Pennsylvania authority to alter or interfere with the district attorney's conduct of law enforcement activities.

Prior to 1850, investigation and prosecution of crime in Pennsylvania were exclusively the duty of the Attorney General, a Commonwealth official. In practice, that official discharged the duties imposed on him by the appointment of deputy attorneys general empowered to act as his agents within the several counties. *Commonwealth ex rel. Minerd v. Margiotti*, 325 Pa. 17, 188 Atl. 524 (1936). In 1850 the General Assembly enacted legislation transferring the duties performed by such appointed deputy attorneys general to an official elected by the voters of the county and designated "district attorney," Act of May 3, 1850, P.L. 654, §1. Interestingly, the only description of the duties of district attorneys in that act was as follows: "the officer so elected shall sign all bills of indictment, and conduct in court all criminal or other prosecutions in the name of the commonwealth, or when the state is a party, which arise in the county for which he is elected, and perform all the duties which now by law are to be performed by deputy attorney generals. . . ."

It would seem clear from this language that the only significant change accomplished by the Act of 1850 was the alteration in *the manner of selecting officers* to enforce state criminal laws and to act as the state's legal representative in each county. There can be no doubt, especially in light of the decisions of this Court that the Attorney General of the Commonwealth

may supersede any district attorney,[5] that the essentially state-character of criminal law enforcement was not affected.

Article XIV, §1 of the Constitution of 1874 designated district attorneys, along with several other officials, "county officers."[6] Despite this designation, the essentially state-character of the duties and functions of the district attorney's office and the manner in which they were to be discharged was not affected. An examination of the entire language of Article XIV, as it stood at the time of its adoption, shows that it was concerned solely with the election and compensation of the various "county officers" named in §1. Not one word of the article as originally written concerns the functions or duties of district attorney or any other so-called county officer therein mentioned.

On April 21, 1949 the General Assembly adopted the First Class City Home Rule Act. Act of April 21, 1949, P.L. 665, 53 P.S. §§13101-13116, 13131, 13133. Germane to the instant question was the following language of §17 (53 P.S. 13131) of the act: "the city . . . shall have and may exercise all powers and authority of *local self-government* and shall have complete powers of legislation and administration *in relation to its municipal functions,* including the power and authority to prescribe the elective city officers, who shall be nominated and elected only in the manner provided by, and in accordance with, the provisions of

---

[5] *Commonwealth ex rel. Minerd v. Margiotti,* 325 Pa. 17, 188 Atl. 524 (1936) ; *Margiotti Appeal,* 365 Pa. 330, 75 A. 2d 465 (1950).

[6] "County officers shall consist of sheriffs, coroners, prothonotaries, registers of wills, recorders of deeds, commissioners, treasurers, surveyors, auditors or controllers, clerks of the courts, district attorneys, and such others as may from time to time be established by law; and no sheriff or treasurer shall be eligible for the term next succeeding the one for which he may be elected."

This language was amended on November 6, 1945 to delete the words "sheriff or" in the last clause.

the Pennsylvania Election Code and its amendments, for the nomination and election of municipal officers. The charter . . . may provide for a form or system of municipal government and for the exercise of any and *all powers relating to its municipal functions . . . .*" (Emphasis supplied.) as well as the following language from §11 (53 P.S. §13111) of the act: "Any new charter or amendments to the charter . . . shall become the organic law of the city at such time as may be fixed therein. . . . So far as the same are consistent with the grant of powers and the limitations, restrictions and regulations hereinafter prescribed, they shall supersede any existing charter and all acts or parts of acts, local, special, or general, *affecting the organization, government and powers of such city, to the extent that they are inconsistent or in conflict therewith.*" (Emphasis supplied.)

It is clear from an examination of the quoted language that the changes authorized by the First Class City Home Rule Act were restricted to matters affecting local and municipal government. Nowhere is there any intimation that changes in the performance of state functions, which as we have seen the district attorney performs, were authorized. Indeed, nowhere in the First Class City Home Rule Act is there even a reference to the power of the city to affect "county officers" as the district attorney was designated in Article XIV, §1 of the Constitution. Therefore, as far as this legislation is concerned, the General Assembly in no way disturbed pre-existing laws regarding the nature of district attorneys' functions and duties or the powers of local government with regard to them.

On November 6, 1951, Article XIV of the Constitution was amended by the addition of §8. That section pertinently provided as follows: "(1) In Philadelphia all county offices are hereby abolished, and *the city shall henceforth perform all functions of county gov-*

*ernment* within its area through officers selected in such manner as may be provided by law. (2) Local and special laws, regulating the affairs of the city of Philadelphia and creating offices or prescribing the powers and duties of officers of the city of Philadelphia, shall be valid notwithstanding the provisions of section seven of article three of this Constitution. (3) All laws applicable to the county of Philadelphia shall apply to the city of Philadelphia. . . . (7) Upon adoption of this amendment all county officers shall become officers of the city of Philadelphia, and, until the General Assembly shall otherwise provide, shall continue to perform their duties and be elected, appointed, compensated and organized in such manner as may be provided by the provisions of this Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective, but such officers serving when this amendment becomes effective shall be permitted to complete their terms." (Emphasis supplied.) In this case, an attempt has been made to draw from this language the conclusion that the district attorney is a "city officer" for purposes of giving him the subpoena powers created under §8-409 of the Charter. We believe such a result is not warranted because nothing either in the language of Article XIV, §8 or the cases decided under it suggests that the city or its electors were thereby empowered to alter the functions, duties or powers of the offices in question.

The language of Article XIV, §8, for instance, indicates nothing touching the powers, duties and functions of the district attorney. The phrases abolishing county offices and stating the "city shall henceforth perform all functions of county government" certainly do not have this effect. For, while the district attorney may have been a "county officer" by virtue of Article XIV, §1, in the sense that he was elected on a county basis, and while his "office" qua "county office" may

thereby be abolished, since his functions, powers and duties were never those of "county government", a phrase vesting such functions, powers and duties in the city has no effect on him. Indeed in the opinion of this Court in *Commonwealth ex rel. Truscott v. Philadelphia,* 380 Pa. 367, 111 A. 2d 136 (1955) we declared that in the absence of specific statutory authorization from the Legislature, the Home Rule Charter did not give the City Council of Philadelphia the power to abolish the Board of Revision of Taxes, because despite the fact that that office became a "city office" by virtue of Article XIV, §8,[7] Article XIV, §8 did not give the City Council or electors of Philadelphia the right to change its duties or functions.[8] If this is true as to the effect of the Charter with respect to the Board of Revision of Taxes, it is at least equally correct with

[7] In *Lennox v. Clark,* 372 Pa. 355, 93 A. 2d 834 (1953) this Court held that by reason of Article XIV, §8 of the Constitution, the Board of Revision of Taxes along with certain officials designated as "county officers" in Article XIV, §1 of the Constitution were within the Charter to the extent that employees of their offices were subject to the civil service requirements of the Charter. The employees of the district attorney's office were not considered in *Lennox,* although the Court assumed arguendo that employees of the District Attorney were subject to Charter civil service in *Schultz v. Philadelphia,* 385 Pa. 79, 122 A. 2d 279 (1956). Of course, in *Schultz* we were not squarely presented with the issue as to whether employees of the District Attorney were subject to the Charter and that case did not decide the issue. In the present case, we do not mean to or need to intimate a view as to whether employees of the District Attorney's office are subject to the civil service provisions of the Charter, since that issue is completely distinct from the question as to whether the Charter affects the duties and functions of the district attorney.

[8] See *Commonwealth v. Reis Enterprises, Inc.,* 31 Pa. D. & C. 2d 402, 407 (C.P. Philadelphia County, 1963) which in discussing the effect of the Charter after *Lennox* and *Truscott* states: "It is clear, therefore, that only an act of the General Assembly may alter or modify the duties and functions of the district attorney. . ."

respect to an office such as the district attorney's so indelibly associated with and necessary to the concerns of state government.

Further support for the conclusion that the designation of an official as a "county officer" in Article XIV, §1 of the Constitution does not, by virtue of Article XIV, §8 make him subject to the Charter in all respects, is provided by the decision of our Court in *Lennox v. Clark*, 372 Pa. 355, 93 A. 2d 834 (1953). There we held that despite the designation of the prothonotary and register of wills as "county officers" in Article XIV, §1, the adoption of Article XIV, §8 did not convert them into city officers for purposes of making their employees subject to the civil service provisions of the Charter. While this conclusion was based on a reason somewhat distinguishable from the instant case,[9] *Lennox* does indicate that this Court has on a previous occasion eschewed a literal and insensitive interpretation of the designation "county officer" in Article XIV of the Constitution. Moreover, the decision in *Lennox* is particularly pertinent since we there held that what at first seemed to be the alteration in the character of the offices of prothonotary and register of wills by constitutional language adopted in 1951 had not in fact occurred in light of a careful consideration of the language of Article V, adopted in 1874.

The conclusion that the district attorney is essentially a state officer whose powers, duties and functions are not affected by the Charter is confirmed by many additional observations. To begin with, it

---

[9] *Lennox* decided that the employees of the prothonotaries and registers of wills should not be subject to the civil service provisions of the Charter because the specific mention of these two officers in Article V, §§7 and 22 of the Constitution indicated that they and their employees were to be under the control of the judiciary.

would certainly be anomalous to say that while the District Attorney of Philadelphia has general subpoena powers, neither the Attorney General, who may supersede him,[10] nor any other district attorney in the Commonwealth has such powers. It is also striking that while the General Assembly has since the effective date of the Charter specifically granted the City Council or electors of Philadelphia "full powers to legislate with respect to the election, appointment, compensation, organization, abolition, merger, consolidation, powers, functions and duties" of such "county officers" as Coroner, Recorder of Deeds, City Treasurer, Clerk of the Court of Quarter Sessions, Oyer and Terminer and General Jail Delivery, Sheriff, City Commissioners, Registration Commission and Board of Revision of Taxes,[11] Act of August 26, 1953, P.L. 1476, §2, as amended, Act of August 13, 1963, P.L. 795, §1, 53 P.S. §13132 (Supp. 1966), its legislation with respect to the District Attorney of Philadelphia has consisted of a statute prescribing the manner of his election, Act of August 26, 1953, P.L. 1476, §3, 53 P.S. §13152 and the statutes fixing the amount of his compensation, Act of August 9, 1955, P.L. 312, now amended by Act of June 14, 1961, P.L. 371, 16 P.S. §7706 (Supp. 1966).[12] If nothing else does, the juxtaposition of the sets of enactments above should make clear that the General Assembly, at least, has never regarded the office of district attorney to be appropriate for or subject to legislation adopted at a local level.

Finally, it should be noted that lack of the subpoena powers here sought will not in any meaningful sense

---

[10] Cases cited supra note 5.

[11] This accounts for most of the officials, besides the district attorney, designated as "county officers" in Article XIV, §1 of the Constitution.

[12] Compare §3-600 of the Charter fixing the compensation of officers thereunder.

interfere with the District Attorney of Philadelphia's unquestionable right and duty to investigate the official conduct of Philadelphia magistrates.[13] Like every other district attorney, he may obtain the production of witnesses and documents by court issued subpoenae at preliminary hearings, grand jury proceedings and trials. Moreover, either the district attorney or his investigators are entitled by statute, Act of June 15, 1937, P.L. 1743, §6, as amended, Act of May 9, 1949, P.L. 1028, §2, 42 P.S. §1106 to go to the offices. of magistrates and inspect public records and documents. Refusal of a magistrate to observe that right can be remedied in an appropriate proceeding.

Order reversed.

CONCURRING OPINION BY MR. JUSTICE COHEN:

I concur with the majority's decision that the District Attorney of Philadelphia does not possess the power to issue subpoenas. However, unlike the majority opinion, I reach my conclusion without finding it necessary to determine that the district attorney is excluded from the Philadelphia Home Rule Charter. Nor do I decide that he is included in the Home Rule Charter. I deem it inappropriate for this Court to make a determination on an issue of such far-reaching consequences when we have not had the benefit of briefs and argument solely devoted to that matter. This is especially so in light of the fact that, without exception, in every case wherein the issue involved the powers of the office of district attorney, the City Solicitor of Philadelphia represented the district attorney's office in court. This would indicate that in the past no question was raised as to the propriety of regarding the

[13] Nor will lack of subpoena power reduce his ability to discharge his duty of enforcing the general criminal statutes of the Commonwealth.

520

district attorney as a city officer inasmuch as §4-400 of the Home Rule Charter provides that the Law Department "shall represent the City and every officer, department, board or commission in all litigation." See *e.g. Cathcart v. Crumlish*, 410 Pa. 253, 189 A. 2d 243 (1963); *Kingsley International Pictures Corporation v. Blanc*, 396 Pa. 448, 153 A. 2d 243 (1959).[1]

The Act of June 3, 1919, P.L. 369, §1, 16 P.S. §7741 empowers a district attorney to appoint county detectives to investigate and report to him the conduct in office of the magistrates. That act cannot be cited as authority for lodging in the district attorney the power to issue subpoenas in the course of his conduct of an investigation. For one thing, the statute vests in the county detectives the power to investigate the magistrates and limits the authority of the district attorney to that of an appointing power. Moreover, even if the Act of 1919 be construed to authorize the district attorney to conduct investigations of the magistrates, I would require an express authorization to him to issue subpoenas to aid in such investigations. No one piece of legal paper carries with it the abusive potential to subject innocent persons to adverse and detrimental publicity than a subpoena. This Court should not grant the subpoena power to a public officer to whom such power has not been expressly granted by legislation. In *Commonwealth ex rel. Margiotti v. Orsini*, 368 Pa. 259, 263 81 A. 2d 891, 893 (1951) we stated that: ". . . *neither an attorney general, nor a district attorney whom he supersedes, has any common law power of*

---

[1] Indeed, the brief filed by the district attorney, the brief filed on behalf of amicus curiae, Crime Commission of Philadelphia, and the brief filed on behalf of amici curiae, Greater Philadelphia Movement and Chamber of Commerce of Greater Philadelphia, all seek to vest in the district attorney the subpoena power by virtue of his being a city officer subject to the Philadelphia Home Rule Charter.

*subpoena. . . . The power of subpoena, except by a court, is purely statutory.*

"The law is well settled that the power of subpoena which formerly was exclusively a judicial power, may now be granted to nonjudicial bodies, commissions, agencies or officials *by statute, but the power and the extent of the power is to be determined in each case by the express statutory grant."* (Emphasis in the original.) That case held that §520 of The Administrative Code which expressly grants to every administrative department the power to issue subpoenas in furtherance of *hearings,* does not extend to *investigations* of alleged violations of the law. Likewise, we should now hold that where a statute authorizing an officer to conduct investigations does not *expressly* include the power to issue subpoenas, such power is nonexistent in the office.

Even if the district attorney is considered subject to the Home Rule Charter, §8-409 must be construed to provide for subpoena power pertaining only to the investigation of the conduct of city government and matters relevant thereto. Because the Home Rule Charter is the root of city government in Philadelphia and because of the potential abuses inherent in the power to issue subpoenas, this limitation on §8-409 is necessary and wise. Since Article V, §§1 and 12 of the Pennsylvania constitution makes magistrates constitutional judicial officers and under *Lennox v. Clark,* 372 Pa. 355, 93 A. 2d 834 (1953), judicial officers are not subject to the Home Rule Charter, the magistrates are not officers of city government and are not subject to subpoena by any city officer under §8-409. Accordingly, I join the judgment of reversal, but only on the basis stated.

---

CONCURRING OPINION BY MR. JUSTICE EAGEN:

A district attorney does not have any common law power of subpoena, nor has such ever been specifically

granted by statute. The powers and functions of the office are basically defined in the Act of May 3, 1850, P.L. 654, §1. Under §18(b) of the Act of April 21, 1949, P.L. 665, 53 P.S. §13133(b), pursuant to which the Philadelphia Home Rule Charter was adopted, the city is specifically precluded from limiting or enlarging upon the powers of the offices which were already fixed by the legislature. Hence, whether or not the office of the district attorney of Philadelphia is a "city office" and within its Home Rule Charter, the city could not validly enlarge upon the powers thereof. If §8-409 of the Philadelphia Home Rule Charter is construed to apply to the district attorney, it would clearly constitute an attempt by the city to enlarge upon the power of that office which it legally may not do.

I, therefore, concur in the result reached in the opinion of Mr. Justice ROBERTS.

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Let it be said at once that the decision in this case has nothing to do with the question being argued in the public square as to whether a district attorney must, under the law, resign his office in order to be a candidate for the office of Mayor of Philadelphia. That question is as foreign to the issue in this litigation as the proposed trip to the moon is foreign to the contemplated deep-sea-diving expedition in the Atlantic to raise the ill-fated *Andrea Doria*.

The proposition as to whether a district attorney in office may be a candidate for mayor is referred to here only because the principle of judicial notice compels us to mention it. Public statements by high ranking officials in government, observations by public commentators, and a widespread discussion of the subject in all the communication media oblige us to take cognizance of what is common knowledge. This is neces-

sary in order to obviate the possibility, indeed the probability, that there may be read into the decision of this Court what is not there, and which has no right to be there. The question as to whether a district attorney may be a candidate for mayor without resigning his office was never at any time part of the current litigation. It does not appear in the formal pleadings, it is not mentioned in the printed briefs, it was not orally argued when the parties appeared before this Court to present their respective positions. It is not in this case at all.

To attempt to use the decision of this Court as a judicial pronouncement on a matter which is in no way before us is like trying to grow pears on an apple tree. The apple hanging on the tree of decision in this case has to do with the proposition as to whether the District Attorney of Philadelphia may, according to law, in discharging the functions of his office, subpoena to his office such persons he deems amenable to interrogation. That is the issue, that is the apple, and no amount of argumentation or interpretation can transform that apple into a pear. No mixing of seeds, no amount of botanical treatment or alimentation can grow a coconut on a banana tree, and no type of analysis, construction, exposition or diagnosis can read into this decision what is absolutely not there.

The District Attorney's brief proclaims the issues in the case at bar as follows:

"I. Does the District Attorney of Philadelphia have subpoena power under Section 8-409 of the Philadelphia Home Rule Charter?"

"II. Did the District Attorney of Philadelphia have the power under the Philadelphia Home Rule Charter to institute the action in the Court below?"*

---

* He submitted a third question, namely, "Is the District Attorney by exercising his subpoena power attempting to supervise a judicial officer?" He answered this in the negative.

He answers these questions in the affirmative. It was argued by him, and by other attorneys speaking in behalf of the Commonwealth, that the district attorney has the right to subpoena any person, any time, anywhere. It is not to be doubted, of course, that the district attorney may conduct investigations. Indeed, he could not discharge the constitutional duties of his office without investigation. These investigations can be conducted, and from time immemorial have been conducted, outside his office at the scene of the asserted crime, or at places geographically or objectively associated with the *locus delicti*. County detectives, under the direction of the district attorney, call on people linked in some way to the event under investigation. The county detectives visit witnesses at their homes and at their places of employment, and elsewhere, and then report to the district attorney what they have ascertained. This is proper and indeed necessary.

But to subpoena persons to the district attorney's office, under penalty of jail, for refusing to obey the subpoena, is a policeman in a different uniform. Unlimited subpoena jurisdiction would arm the district attorney with a weapon of harassment and oppression which could destroy the right of privacy which is the constitutional prerogative of every American. Such subpoena powers smack of the search and seizure practices of the tyrannical government of George III, which our Revolutionary War forefathers wiped out with their blood on the field of battle. And, it was to prevent any future violation of the right of the people to be secure in their homes, that the United States enacted Amendment IV of the Federal Constitution, and Pennsylvania enacted §8, Article I of our own State Constitution.

In spite of these constitutional sentinels guarding the rights of liberty of our citizens, the district attorney seeks the authority to drag people to his office willy-

nilly, there to await his pleasure. This kind of authority would allow district attorney subpoena-servers to knock at doors in the middle of the night. This type of subpoena domination could take mothers away from their small children, invalids out of hospitals, and aged persons out of institutions. Nowhere in the United States does a district attorney boast such governmental omnipotence. Indeed, no official in any civilized democratic country may wield such a despotic club. Only in Communist countries and in police states is that kind of despotism part of government.

The subpoena is perhaps the most potent edict issuing out of peaceful civil government, next to conscription. In effect, the subpoena is temporary conscription. Of course the subpoena is indispensable in the orderly administration of justice, but, because of its arbitrariness, it is to be exercised only under the supervision and control of the courts, the subpoenaed person being protected by the law at every step of the proceedings. Thus, when a witness is subpoenaed to testify before a grand jury, he appears before a body of sworn arbiters and he enjoys protection because of the very multiplicity of the auditors; when he testifies in court, he does so in an open courtroom under the watchful and protective eye of a judge. But if he is brought before a district attorney, he stands before an accusatory officer, is subjected to an ex parte proceeding, and can call on no one to protect him. Fairness rebels, justice condemns, and our whole legal system, which frowns on ex parte proceedings, denounces such an infringement of the inalienable rights of privacy and liberty.

What the district attorney is arguing for, in effect, is that we allow him to make himself a one-man grand jury. Obviously, this is constitutionally impossible.

The district attorney, in arguing before us, said that no one could be injured by his wielding of subpoenas

because no penalty would be imposed on an unwilling witness without his having the right to go to court to demand a hearing. This is scant comfort to the man who depends on daily toil for a living, and who would be compelled to take time off from work, losing his wages, in order to protect himself from a subpoena improvidently issued. This would be no relief to the housewife who has children to care for. This would not help the business man with commercial commitments requiring his presence. All those who would protest to being hauled before a non-judicial official, for inquisition on any subject, at the district attorney's pleasure, would be compelled to hire lawyers, although innocent of wrongdoing, in order to prevent an even greater deprivation of their rights. Going into court they might have to wait around for days to be heard, while their reputations would suffer from inferences and implications that some culpable act had been committed by them. All this makes for coercion and injustice which have no place in America where one has the right to be left alone until the judicial machinery moves with ample protection for the rights of all concerned.

As I have already indicated, the district attorney may conduct investigations. The Act of June 3, 1919, P.L. 369, §1, as amended, 16 P.S. §7741, describes the duties of county detectives to "investigate and make report to the district attorney as to the conduct in office of magistrates, constables, deputy constables, and other officers connected with the administration of criminal justice; to make such investigation and endeavor to obtain such evidence as may be required by the district attorney in any criminal case; and perform such other duties as the district attorney may direct."

In spite of the fact that this Act specifically refers to the investigation of magistrates, and specifically declares that the district attorney may require detec-

tives to obtain evidence, it says nothing about the issuance of subpoenas. If the Legislature had intended that the district attorney should have the authority to issue subpoenas, in connection with the investigations of magistrates, or in any other investigation, this is where that power should have been granted.

The Majority Opinion speaks of the district attorney as a "county officer." That is what he *was*. He is no longer a county officer. As Chief Justice BELL points out in his Dissenting opinion: "This Constitutional amendment [Adopted November 6, 1951] in the clearest language specifically provided that *all county* officers shall become officers of the City of Philadelphia." (Emphasis in original.)

The Chief Justice said further: "Moreover, under the provisions of the Home Rule Charter and the Constitutional Amendment of 1951, this County District Attorney became a *City* officer who is elected and paid by the citizens of Philadelphia." (Emphasis in original.)

Article XIV of the Constitution, amended by addition of §8, on November 6, 1951, states: "Upon adoption of this amendment all county officers shall become officers of the city of Philadelphia, and, until the General Assembly shall otherwise provide, shall continue to perform their duties and be elected, appointed, compensated and organized in such manner as may be provided by the provisions of this Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective."

It will be noted that, although the county officers become city officers, their duties are to continue as they were "at the time this amendment becomes effective." And, of course, no one at all contends that the district attorney ever had common law or constitutional subpoena powers. The district attorney himself, in arguing his case before this Court, insisted that under the Philadelphia Home Rule Charter he possessed the sub-

poena rights granted city officials. The Crime Commission of Philadelphia, Inc., in its brief amicus curiae, supporting the district attorney, declared that the district attorney is a "city officer." The Greater Philadelphia Movement and Chamber of Commerce of Greater Philadelphia, in their brief as amici curiae, supporting the district attorney, declared that by virtue of the City-County Consolidation Amendment, the district attorney has been made an officer of the City of Philadelphia. These positions are all well taken, since there can be no doubt that the district attorney is a city officer under the Philadelphia Charter, but his status as a city officer does not confer on him powers greater than those which were possessed by the District Attorney of Philadelphia County before he became a city officer.

It is commonplace history that the district attorney's office is an offshoot of the office of Attorney General of the Commonwealth. Prior to 1850, the Attorney General was the chief prosecuting officer of the Commonwealth. He was represented in the various counties by deputies. In 1850, the office of District Attorney was created and that officer was charged with the performance of the duties theretofore discharged by the deputies attorney general. The Attorney General may, in certain situations, supersede the district attorney and act in his stead. The Attorney General admittedly has no subpoena powers. If the Attorney General has no subpoena powers, certainly the district attorney, who may be displaced by the Attorney General, would have no greater powers than his superior. The second mate of a ship cannot exercise an authority denied the captain himself.

During the oral argument before this Court, I put to the attorneys for the appellee the following proposition. Suppose the district attorney in the exercise of the powers of his office concluded that he wished

to know the drinking habits of people living in a certain area or community. "Is it the position of the district attorney," I asked, "that the district attorney may call to his office every citizen in that community and question him as to the kind of beer he drinks, whether he takes a highball, and generally, inquire into his personal habits?" I was appalled to hear this question answered in the affirmative.

It was said, in attempted mitigation of this frightening claim of dictatorship power, that a district attorney would not abuse his authority. But we know only too well that power feeds upon power. This is a government of laws and not of men, and the way to prevent abuse of power is not to hand out the key to the Tower of London. The sure way to prevent the sway of the sceptre is not to hammer out a sceptre. Dictatorship in a district attorney's office is just as taboo as it is in national office.

The defendant in this case, M. Phillip Freed, is a magistrate in the City of Philadelphia. On March 10, 1966, the District Attorney of Philadelphia typed out, or had someone type for him, on his letterhead a few words in which appeared the expression: "You are commanded to appear at Room 666, City Hall, on Friday, March 18, 1966, at 10:00 a.m., and to bring with you certain papers. . ."

The district attorney entitled this paper: DISTRICT ATTORNEY'S SUBPOENA DUCES TECUM, and it was delivered to Magistrate Freed, who refused to be intimidated by this "command" performance. He said that the district attorney had no authority to command him to proceed to Room 666, which is the location of the district attorney's office, not a courtroom. The district attorney then petitioned the court of common pleas to issue an order "commanding compliance with the District Attorney's Subpoena Duces Tecum."

The paper signed by the district attorney, despite its imperious language, was simply a letter from the district attorney, not a subpoena duces tecum. As a book cannot be judged by its cover, a paper cannot be classified by its title. The district attorney has no authority in law to issue subpoenas. Nor does he need that power. All dockets and records in a magistrate's office are open to public inspection. The district attorney has the right to examine those records, and if the magistrate refuses to exhibit them, there are legal means to compel obedience to the law. Ordering him to the district attorney's office with his trappings on his back is not one of those means.

The magistracy of Philadelphia is part of the judicial system of Pennsylvania. The Pennsylvania Constitution, Art. V, §1, provides: "The judicial power of this Commonwealth shall be vested in a Supreme Court, in courts of common pleas, courts of oyer and terminer and general jail delivery, courts of quarter sessions of the peace, orphans' courts, *magistrates' courts*, and in such courts as the General Assembly may from time to time establish." (Emphasis supplied)

In *McNair's Petition*, 324 Pa. 48, this Court said: "The office of magistrate in this Commonwealth has always been recognized as a judicial office. . . Within the sphere of their powers they have all the attributes of legally constituted courts of justice and are independent of any other tribunal except insofar as their action is reviewable on appeal."

If the district attorney would have the power to subpoena magistrates into his office, he would also have the power to compel a judge of the court of common pleas to appear before him and answer for his decisions, producing, at the district attorney's behest, his (the judge's) records, documents, opinions, decisions, etc., all of which is absurd. Indeed, carrying this proposition to its logical ultimate conclusion, the

district attorney could summon even a Justice of the Supreme Court to stand before his high-backed chair of assumed procurator sovereignty.

It is enough merely to state these propositions to reveal the ludicrous extent of the authority sought here by the district attorney. In the joyous ringing of the Liberty Bell on that immortal July 4th of 1776, the peal which sounded most melodious and was most comforting and assuring to the embattled colonists, now Americans, was that of the Independence of the Judiciary. What the district attorney asks for here would crack the Liberty Bell into a wider chasm than the wound it presently suffers.

If the district attorney possessed the power he claims in this case, he would be in a position to generate chaos in the whole judicial system. Sitting comfortably in his office, he could write out subpoenas by the hundreds and employ drays, trucks and other vehicles to haul all the judicial records of the county to his office. He could thus destroy the courtrooms and the entire machinery of justice more effectually than an enemy could do so by dropping a bomb on William Penn's hat.

But the situation presented in this case is even worse than I have already outlined up to this point. The function of a district attorney is to investigate and prosecute *crime*. He may not, for personal reasons, or out of whim or caprice, subject innocent persons to surveillance, interrogation or temporary deprivation of freedom. After all, a subpoena is just that, a fetter on a man's liberty of movement. A subpoena commands that its recipient drop all other activities and commitments and proceed to a certain place at a certain time to give answers to certain questions put to him. And he is not relieved of that responsibility, he is not liberated from that mobile imprisonment, until he has answered the questions and has produced what has been demanded of him.

Obviously, it would be unthinkable, or should be, that a district attorney should be empowered to summon anyone to his office and badger him with questioning, if there is no reason to assume that that person is in any way involved in the commission of a criminal deed. Is Magistrate M. Phillip Freed charged with any criminal act? Were there any circumstances which would justify his being harassed by a subpoena? Listen to the district attorney himself.

At the hearing before Judge SLOANE of the court of common pleas, Attorney Finkelstein, representing Magistrate Freed, said that his client "has nothing to hide in this case." The district attorney affirmed this statement: "I certainly do not contradict in any way Mr. Finkelstein's statement that Magistrate Freed has nothing to hide. *There has never been any contention by the district attorney's office of any impropriety of any nature whatsoever by Magistrate Freed.*" (Emphasis supplied.)

We see here that the district attorney acknowledges, not only that Magistrate Freed is not charged with any crime, but that he is not even accused *of any impropriety of any nature whatsoever!*

This is about as clean a shirt as a man can wear. "No impropriety of any nature whatsoever." And yet, in spite of that immaculate laundry worn by Magistrate Freed, in the words of the district attorney himself, the district attorney demands that Magistrate Freed leave his office, his home, his family, his duties, his companions and proceed to the office of the district attorney and stand accused, in the eyes of the public, of some kind of wrongdoing. Is this just? Is this law? I don't think so.

Since the district attorney does not need a subpoena in this case, because he admits that Magistrate Freed is clean of any impropriety, or charge of impropriety, the only possible conclusion is that the

district attorney desires this Court to arm him with an unlimited authority to subpoena so that he may use that authority in future situations. In other words, he asks us for a weapon to place in his armory of prosecution to employ in cases where a defendant may be just as innocent and absent of fault, as the district attorney admits Magistrate Freed is absent of fault and wrongdoing. The district attorney asks for a blunderbuss to employ as he wishes. He asks for a power to harass, intimidate and embarrass honest citizens when it might suit him to harass, intimidate and embarrass. It is not enough to say that no district attorney would so use that blunderbuss. The best way to guarantee its non-use is not to stack it in the corner of any district attorney's office.

Even the lower court, which strangely believes that the district attorney should have the blunderbuss, admits that Magistrate Freed has done nothing wrong: The Hearing Judge said in his opinion: "I am quick to say, an investigation there is, but no present charge of wrong is made against Magistrate Freed either by what I say or in what Mr. Specter requests."

Yet, in spite of this exoneration of any wrongdoing on the part of Magistrate Freed, in spite of this absence of even a charge of wrongdoing, the Hearing Judge decided that the district attorney was entitled to issue a subpoena duces tecum. How did he arrive at this conclusion? He arrived at it with a syllogistic non sequitur which must take its place among the classic non sequiturs in the chronicles of sophistry. The Hearing Judge said: 1. "He [the district attorney] may investigate the conduct of magistrates. 2. He may investigate to obtain evidence in any criminal case." After laying down these categorical premises, the Hearing Judge sweeps into his syllogistic conclusion with the statement: "It follows then that the district attorney has the statutory power of subpoena."

But how does *it* follow? When you say that a district attorney has the "statutory power" of subpoena, the simplest way to demonstrate that he has that statutory power is to point to the statute which gives him that power. The Hearing Judge, however, pointed to no statute as, of course, he could not. The untenability of the Hearing Judge's syllogism may be illustrated by using medical instead of legal nomenclature. Thus, paraphrasing the Hearing Judge's language, it could be said: 1. A doctor may investigate the conduct of his patient in order to determine symptoms. 2. He may investigate to obtain evidence to determine the cause of the disease from which his patient suffers. Therefore, it follows that the doctor has the statutory power to operate on any part of the patient's body, including amputation, without liability in the event the wrong part of the body is cut, or the wrong limb is detached.

Granting the district attorney the powers he seeks in this case would be to give to a district attorney, any district attorney, a scalpel and saw with which he could sever away the most fundamental right of American citizenship, the right to be let alone to pursue one's way in accordance with law and justice. This Court could not possibly grant the district attorney this startling demand.

The District Attorney of Philadelphia, formerly a county officer, is now a city officer under the Philadelphia Charter, and as such city officer, he has no subpoena powers.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

In this case, the majority have tunneled under the Himalayan mountains of the Pennsylvania Constitution in order to achieve their desired and what they believe is a worthy and wise goal. *The Constitution*

*of Pennsylvania,* in language which is crystal clear, states that District Attorneys are *County*—not State—officers, and in Philadelphia are now *City*—not State—officers, and neither blinders nor any procrustean stretch can alter or change this clear language.

The Constitution of Pennsylvania of 1874 provided in Article XIV: "Section 1. *County officers shall consist of* sheriffs, coroners, prothonotaries, registers of wills, recorders of deeds, commissioners, treasurers, surveyors, auditors or controllers, clerks of the courts, *district attorneys** and such others as may from time to time be established by law; and no treasurer shall be eligible for the term next succeeding the one for which he may be elected."

In *Commonwealth ex rel. Minerd v. Margiotti,* 325 Pa. 17, 188 Atl. 524, the Court said (page 29) : "Prior to 1850 it was the custom of the Attorney General, exclusively by virtue of his common law powers and duties, to prosecute all criminal cases, and for him to appoint deputy Attorneys General in the various counties to represent him in their prosecutions. Thus, in Com. v. English, 11 Phila. 439, it was stated by Judge Pratt that: 'Prior to the act of 1850, creating the office of district attorney, the pleas of the commonwealth were all conducted by the attorney general or his deputies, whom he was authorized by law to appoint, but whose duties have never been fully defined by the legislature. Presumably then, they were the same in the district in which he acted as were those of his principal, the attorney general himself.'

"The Act of May 3, 1850, P.L. 654, 16 P.S. sec. 3431, created the elective office of district attorney, which was unknown at the common law, and among other things provided: 'The officer so elected shall sign all bills of indictment, and *conduct in court all*

---

* Italics throughout, ours.

*criminal and other prosecutions in the name of the commonwealth,* or when the state is a party, *which arise in the county for which he is elected,* and perform all the duties which now by law are to be performed by deputy attorney generals, and receive the same fees or emoluments of office.' . . ." See also to the same effect, *Margiotti Appeal,* 365 Pa. 330, 332, 75 A. 2d 265, and *Com. ex rel. Margiotti v. Orsini,* 368 Pa. 259, 262, 81 A. 2d 891.

On April 21, 1949, the Legislature of Pennsylvania enacted the First Class City Home Rule Act.* This enabling Act (certain relevant and controlling language of which is not quoted in the majority Opinion) authorized any City of the first class to adopt or appropriately enact legislation which would enable it to "exercise all powers and authority of local self-government and . . . have complete powers of legislation and administration in relation to its municipal functions" unless the form or system of municipal government or the legislation enacted thereunder conflict with the Constitution of the United States or the Constitution of Pennsylvania. (§17, 53 P.S. §13131)

Pursuant to the aforesaid enabling Act, the people of Philadelphia adopted on April 17, 1951, a Home Rule Charter, effective January 7, 1952. In the meantime, the people of Pennsylvania adopted on November 6, 1951—effective immediately upon its adoption—an amendment to Article XIV of the Constitution, by adding thereto §8, which pertinently provides: "§8. *City and county of Philadelphia; consolidation of governmental functions; county officers abolished* (1) In Philadelphia all county offices are hereby abolished, and the city shall henceforth perform all functions of county government within its area through officers selected in such manner as may be provided by law. . . .

---

* P. L. 665, 53 P.S. §13101 et seq.

*(3) All laws applicable to the county of Philadelphia shall apply to the city of Philadelphia. . . . (7) Upon adoption of this amendment all county officers shall become officers of the City of Philadelphia,* and, until the General Assembly shall otherwise provide, shall continue to perform their duties and be elected, appointed, compensated and organized *in such manner as may be provided by the provisions of this Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective, . . ."*

This Constitutional amendment in the clearest language specifically provided that *all county* officers shall become officers of the City of Philadelphia.

With respect to the County officers who came within the Charter, the Court, in *Lennox v. Clark,* 372 Pa. 355, 93 A. 2d 834, pertinently said of the Consolidation Amendment (page 366), (1): "Its real and designed result was that, when the former county officers became city officers and the former county employes city employes, *they automatically became subject thereby to the laws then in effect governing and regulating city officers* and employes, and also, of course, to any such laws as might thereafter become effective;" and (2) that the Consolidation Amendment was self-executing and therefore without the necessity of any further action, legislative or otherwise, had transformed certain County officials into City officials as of November 6, 1951 when the Amendment was adopted. However, the questions and issues in this case and in *Carrow v. Philadelphia,* 371 Pa. 255, 89 A. 2d 496, upon which the majority impliedly rely, did not include any question or issue or any decision concerning the status or powers of the District Attorney of Philadelphia.

Furthermore, with respect to certain County officials who also performed certain duties for the Commonwealth, the Court said (page 369): "Some point

has been made of the fact that the former county officers in a few instances performed certain duties on behalf of the Commonwealth and to that extent were acting in the capacity of an officer, agent or employe of the State: [citations]. However, just as the rendition of that service did not militate against their general status as *county** officers, so now its continued rendition does not conflict with their general status as city officers."

Appellant specifically, and the majority impliedly, rely upon *Lennox v. Clark* as holding that the District Attorney of Philadelphia is not a County or City officer but a *Commonwealth officer,* in spite of the clear language of the Constitution *that he is a County officer,* and by the new §8 of Article XIV of the Constitution, a *City officer.* The reliance of the majority and of the appellant upon *Lennox v. Clark* for this proposition cannot be justified or sustained. Prior decisions of this Court concerning the offices therein involved and the reasons upon which those cases were based are clearly inapplicable to the office of District Attorney. *Lennox v. Clark* held that the Prothonotary of Philadelphia is a judicial officer because of the fact that under Article V, §7, of the Constitution, he is (a) appointed by the Judges of the Court and (b) subject to removal by a majority of said Judges, and (c) may appoint only such assistants as may be authorized by said Courts.

In *Lennox v. Clark* the Court further said (page 372): "The same considerations thus applicable to the office of the Prothonotary apply with equal, if not greater, force to that of the Register of Wills, since it has been held that he is a judge and that his probate of wills constitutes a judicial act: Sebik's Estate, 300 Pa. 45, 47, 150 A. 101, 102; West, Admrx., v. Young,

---

* Emphasis in original.

332 Pa. 248, 251, 2 A. 2d 745, 746; Szmahl's Estate, 335 Pa. 89, 92, 93, 6 A. 2d 267, 269.

"He too is the subject of a specific provision in the Constitution. Article V, Section 22, provides that 'In any county in which a separate orphans' court shall be established, the register of wills shall be clerk of such court and subject to its directions, in all matters pertaining to his office; he may appoint assistant clerks, but only with the consent and approval of said court.' Accordingly it is our opinion that the office of the Register of Wills was not converted by the City-County Consolidation Amendment into a city office and therefore has not become subject to the provisions of the Charter."

This Court so held in spite of the fact that the Register of Wills in Philadelphia acts as *Agent of the Commonwealth of Pennsylvania* for the collection of inheritance taxes. No municipal or county functions are performed by the Register of Wills in any of said offices. This Court held (we repeat) that the Philadelphia Register of Wills is a *judicial officer* and his office was not converted by the City-County Consolidation Amendment into a City office and did not become subject to the provisions of the Charter.

It is well established that where ambiguity or conflict exists between a specific constitutional provision* which is unquestionably applicable to a particular person or office or commission or agency and certain general constitutional provisions which would apply if it were not for such ambiguity or conflict, *the specific Constitutional provision will prevail*: *Waits' Estate,* 336 Pa. 151, 154, 7 A. 2d 329; *Philadelphia v. Commonwealth,* 270 Pa. 353, 358, 113 A. 661; *Buckley v. Holmes,* 259 Pa. 176, 188, 102 A. 497; *Commonwealth ex rel. v. Kline* 294 Pa. 562, 567, 144 A. 750; Endlich, Interpretation of Statutes, §216.

---

\* —or a specific provision of a statute.

540

For these reasons, this Court held, in the *Lennox v. Clark* case, that the office of Prothonotary and the office of Register of Wills of Philadelphia County were not converted by the City-County Consolidation Amendment into a City office and did not become subject to the provisions of the Charter.

However, none of the aforesaid provisions of the Constitution, nor any other constitutional provision, nor any relevant authority or sound and applicable reasoning, applies to a District Attorney, because the District Attorney is mentioned only once in the Constitution and in that one instance he is stated to be, as hereinabove set forth, a *County* officer.

Furthermore, it is clear as crystal that the essential and the principal and the most important powers, functions, duties and limitations of (a District Attorney, and especially of) a District Attorney of Philadelphia, are primarily and principally those of a *County* officer dealing with crimes and prosecuting criminals who commit one or more crimes in Philadelphia. Moreover, under the provisions of the Home Rule Charter and the Constitutional Amendment of 1951, this County District Attorney became a *City* officer who is elected and paid by the citizens of Philadelphia.

*The District Attorney of Philadelphia is authorized to conduct investigations and issue subpoenas requiring the attendance of magistrates and the production of their records.*

The right and power and duty of a District Attorney of Philadelphia not only to conduct investigations of alleged illegalities and suspected crimes and criminals has been universally recognized and sustained by this Court, but also and more relevantly his right, power and duty to investigate the conduct in office of magistrates has been ordained by statutes. For example, §1 of the Act of June 3, 1919, P.L. 369, 16 P.S. §7741, provides for the appointment of County detectives

*in Counties of the first class "whose duties it shall
be to investigate* and make report to the district at-
torney *as to the conduct in office of magistrates,* con-
stables, deputy constables, and other officers connected
with the administration of criminal justice; to make
such investigation and endeavor to obtain such evidence
*as may be required by the district attorney in any
criminal case;* and perform such other duties as the
district attorney may direct."

Moreover, §1 of the Act of June 29, 1923, P.L. 973,
16 P.S. §7708, provides for the expenses of District
Attorneys in every County "in the investigation of
crime."

### The Power to Subpoena

In *Com. ex rel. Margiotti v. Orsini,* 368 Pa., supra,
the Court said (page 263) : "The law is well settled that
the power of subpoena which formerly was exclusively
a judicial power, may now be granted to non-judicial
bodies, commissions, agencies or officials *by statute,
but the power and the extent of the power is to be de-
termined in each case by the express statutory grant.
. . ."* (Emphasis in original)

Section 8-409 of the Philadelphia Home Rule
Charter, upon which the District Attorney of Phila-
delphia relies to justify his right and power of sub-
poena, provides: *"Every officer,* department, board or
commission authorized to hold hearings *or conduct in-
vestigations shall have power to compel the attendance
of witnesses and the production of documents* and other
evidence and for that purpose *it may issue subpoenas*
requiring the attendance of persons and the production
of documents and cause them to be served in any part
of the City." A District Attorney is certainly an *"of-
ficer"* within the language and meaning of §8-409, and
one of his important and traditional duties is to con-
duct investigations concerning possible crimes and sus-

pected criminals in Philadelphia. I agree with the District Attorney of Philadelphia that he has a power of subpoena under §8-409 of the Philadelphia Home Rule Charter and that is the *only authority* which gives him a right or power of subpoena. By relying on that authority, he thereby impliedly and necessarily concedes and agrees that he is a *City* officer.

To summarize: It is therefore clear that the District Attorney of Philadelphia has the authority and the power to investigate the suspected illegal actions of magistrates in Philadelphia, and in pursuance thereof, and under and by virtue of the Philadelphia Home Rule Charter, has the authority and power to issue subpoenas duces tecum.*

---

* We note parenthetically that this power is not absolute and unfettered; its illegal use or its misuse or abuse can be restrained or limited by a Court. In their annotation concerning this section of the Home Rule Charter, the draftsmen give as its source §8 of Article XVI of the Act of June 25, 1919, P. L. 581, 53 P.S. §12528, wherein the power of subpoena was given to Philadelphia City Council. The origin of the Act of 1919 is §1 of Article XV of the Act of June 1, 1885, P. L. 37, which conferred on councils of cities of the first-class the right to issue subpoenas. Furthermore and more pertinently, the power of the District Attorney of Philadelphia—one of whose important duties has been traditionally the duty of investigating possible crimes and their possible perpetrators—to issue a subpoena duces tecum has been recognized and approved in *Cathcart v. Crumlish*, C.P. 6, September Term 1961, No. 3411, and *In Re Petition of Wilbur Hamilton*, June Term 1961, and in a formal Opinion No. 261 dated November 13, 1961 by City Solicitor David Berger.

A subpoenaed witness is not subject to an improper or unjustified or illegal subpoena. Section 8-409 further provides: "If any witness shall refuse to testify as to any fact within his knowledge or to produce any documents within his possession or under his control, the facts relating to such refusal shall forthwith be reported to any one of the Courts of Common Pleas of Philadelphia County and all questions arising upon such refusal and also upon any new evidence not included in the report, which new evidence may be offered either in behalf of or against such witness, shall as promptly as possible be heard by such court. If the court

The Powers of the City Solicitor of Philadelphia

Appellant further contends that this proceeding is fatally defective because the District Attorney *personally* appeared before the Court of Common Pleas and before this Court, instead of being represented by the City Solicitor. Appellant points out that under §4-400 of the Philadelphia Home Rule Charter, the City Solicitor is authorized and directed to represent the City and every City officer in all litigation.* While this section is ambiguous, if it is literally construed, as appellant would have us do, it would eliminate to all intents and purposes the vitally important office and all of the duties and functions of the District Attorney of Philadelphia.

It is a matter of common knowledge that the District Attorney or his assistants, and not the City Solicitor (or his assistants), tries every criminal case in the trial Courts, and, in the event of appeal, argues such cases in the appellate Courts. It is clear beyond the peradventure of a doubt that the literal construction of the powers of a City Solicitor, which is advocated by the appellant in this case, is so contrary to the universal practice which exists in Philadelphia (and indeed throughout the State) and is so unreasonable as to be completely devoid of merit.

For each and all of these reasons I dissent, and would affirm the Order of the lower Court.

---

shall determine that the testimony or document required of such witness is legally competent and ought to be given or produced by him, the court may make an order commanding such witness to testify or to produce documents or do both and if the witness shall thereafter refuse so to testify or so to produce documents in disobedience of such order of the court, the court may deal with the witness as in other cases."

* In this case, we note parenthetically that the City Solicitor stated at oral argument that he had no objection to the District Attorney appearing in person to argue the case.