## Commonwealth ex rel. Specter (et al., Appellant) *v.* Moak.

Argued April 30, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Arlen Specter*, District Attorney, with him *Martin H. Belsky*, Assistant District Attorney, for appellants.

*Martin Weinberg*, City Solicitor, with him *Sheldon L. Albert*, Deputy City Solicitor, and *Paul L. Rucci*, Assistant City Solicitor, for appellee.

*Daniel I. Murphy,* with him *Anita G. Cella,* for amicus curiae.

Opinion of Mr. Justice Roberts, July 2, 1973:

On March 7, 1973, appellants, Alessandroni, Brereton, Cohen, Stevens, Jr., Sweeney, and Sylvester—assistant district attorneys in the City of Philadelphia—became candidates for nomination for judge of the court of common pleas for the May, 1973, primary. Appellant Lundy, also an assistant district attorney, became a candidate for nomination for judge of the municipal court.

On the following day, Martin Weinberg, City Solicitor, directed the Finance Director, appellee Lennox Moak, to withhold appellants' pay. In Formal Opinion No. 343, the City Solicitor explained that assistant district attorneys are city employees and, as such, are subject to Section 10-107(5) of the Philadelphia Home Rule Charter.* That section provides: "No officer or employee of the City, except elected officers running for re-election shall be a candidate for nomination or election to any public office unless he shall have first resigned from his then office or employment." Pursuant to the City Solicitor's direction, appellee withheld appellants' compensation.

Appellants filed a complaint in mandamus seeking an order declaring appellants the rightful holders of positions as assistant district attorneys and requiring appellee to compensate them. On March 27, 1973, the complaint was dismissed. This appeal followed and we now affirm.[1]

---

* Adopted by public referendum in 1951.

[1] On March 30, 1973, by order of this Court, appellee was directed to pay appellants "pending final decision on the issues." The order further provided that such payment "shall not render the case moot."

## I.

Initially, appellants contend that they are "quasi-judicial state officers", and, thus, not affected by Section 10-107(5) of the Home Rule Charter which applies only to officers and employees of the City of Philadelphia. While on prior occasions this Court has discussed the applicability of the Charter to the district attorney,[2] we have not previously been confronted with the status of assistant district attorneys. Indeed, on one occasion it was said: "In the present case, we do not mean to or need to intimate a view as to whether employees of the District Attorney's office are subject to the civil service provisions of the Charter, since that issue is completely distinct from the question as to whether the Charter affects the duties and functions of the district attorney." *Commonwealth ex rel. Specter v. Freed,* 424 Pa. 508, 516 n.7, 228 A. 2d 382, 386 n.7 (1967). Cf. *Schultz v. Philadelphia,* 385 Pa. 79, 122 A. 2d 279 (1956).

Appellants maintain that since they perform functions primarily on behalf of the Commonwealth, they should be classified as state employees, rather than employees of the City of Philadelphia. See *Lennox v. Clark,* 372 Pa. 355, 93 A. 2d 834 (1953). We are unable to agree with this contention. The function an employee performs is only one factor in determining whether that individual is a City employee within the meaning of the Charter.

Certainly, it could not be argued that the Mayor is a state officer merely because he has the duty to "cause the ordinances of the city *and the laws of the State* to be executed and enforced." Act of June 25, 1919, P. L. 581, art. II, §6, 53 P.S. §12127 (emphasis added). As

---

[2] See *Commonwealth ex rel. Specter v. Bauer,* 437 Pa. 37, 261 A. 2d 573 (1970); *Chalfin v. Specter,* 426 Pa. 464, 233 A. 2d 562 (1967); *Commonwealth ex rel. Specter v. Martin,* 426 Pa. 102, 232 A. 2d 729 (1967); *Commonwealth ex rel. Specter v. Freed,* 424 Pa. 508, 228 A. 2d 382 (1967).

the City Solicitor properly noted in Formal Opinion No. 343:

"Many officials perform state functions. The Sheriff of Philadelphia performs duties solely on behalf of the courts of Philadelphia County, whose judges are officers of the Courts. See *Dwyer v. Dilworth*, 392 Pa. 123 (1958). The Police Commissioner of the City of Philadelphia enforces the criminal laws of the Commonwealth of Pennsylvania. Under the Home Rule Charter Section 440(d), the City Solicitor is empowered.

" 'With the approval of the Mayor, . . . (to) . . . investigate any violation within the City of the statutes of the Commonwealth of Pennsylvania or the ordinances of the City which may come to its notice, and shall take such steps and adopt such means as may be reasonably necessary to enforce within the City such statutes and ordinances.' "[3]

Other indicia of employment lead us to conclude that assistant district attorneys are City employees and subject to the provisions of the Charter. The City Council of Philadelphia, for example, fixes the number of assistant district attorneys, as well as their salaries. The operating budget for fiscal year 1974 reveals that the District Attorney "Department" has been alloted, by City Council, over $2,300,000 to pay the more than 140 assistant district attorneys. Additionally, the Council has budgeted over $1,100,000 for other office personnel and more than $250,000 for materials, supplies, equipment, and purchase of services. It would be anomalous, indeed, to conclude—as appellants urge—that, although the City establishes the number of assistant district attorneys and fixes their salaries, the assistants are not employees of the City of Philadelphia.

In reaching our determination that appellants are City employees, we are also persuaded by the fact that

---

[3] See Act of August 26, 1953, P. L. 1476, §2, 53 P.S. §13132(c) (Supp. 1973) (sheriff subject to Home Rule Charter).

assistant district attorneys are included in the City's pension plan. Moreover, it is noteworthy that the Philadelphia Code §20-207 specifically exempts "all assistant district attorneys ... from the civil service." Obviously, the Philadelphia Code would not include within its provisions references to those who are not City employees. In view of these circumstances, we are persuaded that assistant district attorneys are City employees within the meaning of Section 10-107(5) of the Home Rule Charter.

## II.

Appellants further urge that the prohibition against political candidacy for public office—expressed in Section 10-107(5)—is an unconstitutional infringement upon their First Amendment rights.

Manifestly, appellants are correct in their assertion that freedom of political expression and activity is embodied in the First Amendment. As the United States Supreme Court said in *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S. Ct. 1203, 1212 (1957): "Equally manifest as a fundamental principle of a democratic society is political freedom of the individual. Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association. This right was enshrined in the First Amendment of the Bill of Rights. Exercise of these basic freedoms in America has traditionally been through the media of political associations."

So, too, it is now beyond cavil that public employees may not be denied constitutional rights on the theory that public employment is a privilege, not a right. " '[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.' " *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734 (1968) (quoting from

*Keyishian v. Board of Regents,* 385 U.S. 589, 605-06, 87 S. Ct. 675, 685 (1967)). Accord, *Shelton v. Tucker,* 364 U.S. 479, 81 S. Ct. 247 (1960); *Slochower v. Board of Higher Education,* 350 U.S. 551, 76 S. Ct. 637 (1956); *Wieman v. Updegraff,* 344 U.S. 183, 73 S. Ct. 215 (1952); *Chalk Appeal,* 441 Pa. 376, 272 A. 2d 457 (1971). See also *Graham v. Richardson,* 403 U.S. 365, 91 S. Ct. 1848 (1971); *Sherbert v. Verner,* 374 U.S. 398, 83 S. Ct. 1790 (1963).

However, the United States Supreme Court has specifically recognized that the State does have certain interests, as an employer, in regulating the activity of its employees. In *Pickering v. Board of Education,* supra at 568, 88 S. Ct. at 1734-35, the Court said: "At the same time it cannot be gainsaid that the State has interests as an employer in regulating the . . . [activity] of its employees that differ significantly from those it possesses in connection with regulation . . . of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the . . . [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

In striking this balance, we are guided by further principles enunciated by the Supreme Court. In *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S. Ct. 556 (1947), for example, the Court rejected a constitutional attack on portions of the Hatch Act and held that Congress may "regulate the political conduct of Government employees 'within reasonable limits,' even though the regulation trenches to some extent upon unfettered political action." Id. at 102, 67 S. Ct. at 571. See also *Oklahoma v. United States Civil Service Commission,* 330 U.S. 127, 67 S. Ct. 544 (1947).

Since the Court's decision in *Mitchell,* some additional tests have emerged to determine the constitution-

ality of restrictions of First Amendment rights. The "reasonableness" test employed by the Court in *Mitchell* has been amplified by the "compelling interest" standard. "Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling." *Bates v. City of Little Rock,* 361 U.S. 516, 524, 80 S. Ct. 412, 417 (1960). Accord, *Sherbert v. Verner,* supra; *Gibson v. Florida Legislative Investigation Com.,* 372 U.S. 539, 83 S. Ct. 889 (1963); *Northern Virginia Regional Park Authority v. United States Civil Service Commission,* 437 F. 2d 1346 (4th Cir. 1971), cert. denied, 403 U.S. 936, 91 S. Ct. 2254 (1971); *National Association of Letters Carriers v. United States Civil Service Commission,* 346 F. Supp. 578 (D.D.C. 1972), cert. granted, 409 U.S. 1058, 93 S. Ct. 560 (1972);[4] *Mancuso v. Taft,* 341 F. Supp. 574 (D.R.I. 1972); *Minielly v. State,* 242 Ore. 490, 411 P. 2d 69 (1966); *Fort v. Civil Service Commission,* 61 Cal. 2d 331, 392 P. 2d 385, 38 Cal. Rptr. 625 (1964).

As the Supreme Court of Oregon recently stated: "The state must show that it has a compelling governmental interest warranting a restriction of a First Amendment right. Bates v. Little Rock, 361 U.S. 516, 524, 80 S. Ct. 412, 4 L. Ed. 2d 480 (1960); Gibson v. Florida, 372 U.S. 539, 555, 83 S. Ct. 889, 9 L. Ed. 2d 929 (1963); NAACP v. Button, supra, 371 U.S. at 438. Such compelling interest must be the controlling justification for the statute." *Minielly v. State,* supra at 505, 411 P. 2d at 76.

Additionally, the governmental unit has the burden of showing that the restriction on the First Amendment activity is the least drastic means for achieving the

---

[4] This case was argued with *Broadrick v. Oklahoma ex rel. Oklahoma State Personnel Board,* 338 F. Supp. 711 (W.D. Okla. 1972), in April, 1973, 41 U.S.L.W. 3521 (1973). See note 8, infra.

governmental purpose. "In a series of decisions this Court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." *Shelton v. Tucker,* supra at 488, 81 S. Ct. at 252 (footnotes omitted). Accord, *Sherbert v. Verner,* supra; *Northern Virginia Regional Park Authority v. United States Civil Service Commission,* supra; *National Association of Letter Carriers v. United States Civil Service Commission,* supra; *Mancuso v. Taft,* supra.

Applying these standards here, we hold that the prohibition on political candidacy in Section 10-107 (5) is a constitutionally permissible restriction on the political activity of Philadelphia's officers and employees. While the test employed in *Mitchell* may not be all inclusive the principle it announced is very much alive today. " 'The evident purpose of Congress in all this class of enactments has been to promote efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service.' " *United Public Workers v. Mitchell,* supra at 96-97, 67 S. Ct. at 568.

We conclude that the City of Philadelphia has a compelling governmental interest which justifies requiring City officers and employees to resign before becoming a candidate for nomination or election for any public office. The reason—as stated in the Annotation to Section 10-107(5)—for imposing this requirement is "because an officer or employee who is a candidate for elective office is in a position to influence unduly and to intimidate employees under his supervision and because he may neglect his official duties in the interests of his candidacy."

Section 10-107(5) is designed to prevent numerous other interferences with the efficency and integrity of the discharging of public duties. The Minnesota Supreme Court summarized the possible abuses in *Johnson v. State Civil Service Department*, 157 N.W. 2d 747, 751-52 (Minn. 1968):

"We are persuaded that the legislature could justifiably determine that the evils referred to constitute a direct threat to the objectives and purposes of a merit system. It could reasonably conclude that to allow employees in the competitive classified service to run for offices which are usually sought for the purpose of earning a livelihood or advancing one's political career would interfere with the efficient and impartial administration of public business by exposing employees and the merit system to the same type of political activities and abuses inherent in a spoils system which the merit system was designed to obviate. Obviously, the legislature could conclude that campaigning for such offices would inevitably interfere with the employee-candidate's time, energy, and devotion to his official duties. No one acquainted with the demands of a campaign for a county office, such as clerk of court, would deny that such demands could, and most likely would, affect a candidate's regular job performance. Undoubtedly, the legislature was not unaware of the probability that an employee seeking such an office could use the prestige of the office he was seeking or his state office to gain special treatment from his superiors—such as leaves of absence and special work assignments—or that his campaign activities would promote or retard his advancement. Further, the legislature doubtless foresaw both the probability of the employee's using his state employment to favor those who might directly or indirectly aid him in his campaign, and, in the context of the rather unique nature of the political structure in this state, where most elective offices (including the legisla-

tive offices and all elective county offices) are declared by statute to be 'nonpartisan', the probability of his exposure to involvement in partisan political activities —with all the potentially disruptive abuses that such involvement could produce.

"While these and many other conceivable abuses may not materialize in every case, the threat the legislature may have feared most was the cumulative effect on the morale and efficiency of all employees by the campaign activities of those who, absent the restriction, would file for office and thereby either directly encourage others to do so or, by their example of the advantages to be gained, induce them to engage in political activities inconsistent with the objectives of the merit system and the efficient and impartial discharge of official duties. To forestall the probability of these and other abuses is, in the judgment of the legislature, the compelling need justifying the restriction." (Footnotes omitted).

It must be concluded that the governmental interest in insuring efficient and impartial administration of public service and avoiding the possible abuses described above may be classified as a compelling governmental interest. See, e.g., *Broadrick v. Oklahoma ex rel. Oklahoma State Personnel Board,* 338 F. Supp. 711 (W.D. Okla. 1972), cert. granted, 409 U.S. 1058, 93 S. Ct. 550 (1972);[5] *Gray v. Toledo,* 323 F. Supp. 1281 (N.D. Ohio 1971); *Stack v. Adams,* 315 F. Supp. 1295 (N.D. Fla. 1970); *Swinney v. Untreiner,* 272 So. 2d 805 (Fla. 1973).

Moreover, the approach adopted in Section 10-107 (5) is the least drastic means to achieve the desired end. It is only by requiring City officers and employees to resign before running for political office, that the people of Philadelphia will be assured of the efficient

---

[5] See note 4, supra.

and impartial discharge of official duties. Unlike many of the statutes which have been held unconstitutional,[6] Section 10-107(5) of the Home Rule Charter suffers from neither vagueness nor overbreadth. See *Wisconsin State Employees Association v. Wisconsin Natural Resources Board,* 298 F. Supp. 339 (W.D. Wis. 1969); *Swinney v. Untreiner,* supra.

Thus we agree with the Court in *Wisconsin State Employees Association v. Wisconsin Natural Resources Board,* supra at 350, "that the relinquishment of the right to run for partisan political office can constitutionally be made a condition of public employment."[7]

## III.

Appellants' remaining arguments are untenable. It is suggested that Section 10-107(5) provides a procedure for removal which is inconsistent with Art VI, §7 of the Pennsylvania Constitution, as implemented by the Act of August 9, 1955, P. L. 323, §450, as amended,

---

[6] See, e.g., *Hobbs v. Thompson,* 448 F. 2d 456 (5th Cir. 1971); *National Association of Letter Carriers v. United States Civil Service Commission,* 346 F. Supp. 578 (D.D.C. 1972), cert. granted, 409 U.S. 1058, 93 S. Ct. 560 (1972); *Huerta v. Flood,* 103 Ariz. 608, 447 P. 2d 866 (1968).

[7] Appellants also contend that they are denied the equal protection of the laws because *state* officers and employees are not required to resign before running for office. This argument, however, is specious. The "function of the Equal Protection Clause, rather, is simply to measure the validity of *classifications.* . . ." *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1 93 S. Ct. 1278, 1310 (1973) (STEWART, J., concurring) (emphasis in original).

Here, the classification created by the Home Rule Charter relates only to *City* officers and employees. The Charter does not—and, indeed, could not—include *state* officers and employees. As the trial court correctly stated: "Employees of the City of Philadelphia are subject to regulations even though such regulations may not be applicable to state employees or employees of other counties."

16 P.S. §450 (Supp. 1973). That Act provides that removal of county *officers* shall be by "impeachment, or by the Governor for reasonable cause . . . or upon conviction of misbehavior in office, or of any infamous crime. . . ."

Appellants maintain that the effect of Section 10-107(5) is to create an additional method of removal not authorized by the Act. They urge that since the City may not exercise its powers "contrary to . . . acts of the General Assembly . . ." (Act of April 21, 1949, P. L. 665, §18, 53 P.S. §13133), the provision of the Home Rule Charter must fail.

The fatal weakness in this argument, however, is that the Act of August 9, 1955, directs the methods for removal of *officers*. We agree completely with the trial court that appellants are employees, not officers, within the meaning of the removal provisions. The trial judge stated: "An Assistant District Attorney is not appointed for a fixed term, but serves purely at the pleasure of the District Attorney. He has no independent powers or authority, but can only exercise such authority as the District Attorney grants to him. The District Attorney can impose such restrictions upon him as he deems fit. The District Attorney can determine whether or not the Assistant can engage in private practice. Under some of his predecessors, Assistants were permitted to devote some of their time to private practice. Important policy questions, such as the practice of plea bargaining, are determined only by the District Attorney and not his Assistants. I think it is clear that Assistant District Attorneys are employees and not public officers." (Footnote omitted). See *Commonwealth ex rel. Foreman v. Hampson*, 393 Pa. 467, 143 A. 2d 369 (1958).

Finally, appellants argue that the Finance Director does not have the authority to declare that assistant

district attorneys have forfeited title to their positions and deny compensation. This contention is meritless. We need not decide whether the Finance Director has power to take such action on his own initiative for, here, appellee acted pursuant to the direction of the City Solicitor who has the authority to "take such steps . . . as may be reasonably necessary to enforce within the City [the] statutes and ordinances [of the Commonwealth and City]." Philadelphia Home Rule Charter §4-400 (d).

On this record we find no basis for disturbing the order of the trial court dismissing appellants' complaint in mandamus.

Order affirmed.[8]

Mr. Chief Justice JONES concurs in the result.

---

[8] Just prior to the filing of this opinion, the United States Supreme Court delivered its opinion in *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S. Ct. 2908 (1973) and *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 93 S. Ct. 2880 (1973), in which the Supreme Court held that restrictions on political activity—similar to those in the Home Rule Charter—are constitutionally permissible.