Richard A. SPRAGUE

v.

F. Emmett FITZPATRICK, Jr.

Civ. A. No. 75–231.

United States District Court,
E. D. Pennsylvania,
Civil Division.

Jan. 9, 1976.

Thomas B. Rutter, Philadelphia, Pa., for plaintiff.

James E. Beasley, Philadelphia, Pa., for defendant.

## OPINION

DITTER, District Judge.

The principal question presented by this case is whether a district attorney's firing of his first assistant for publicly criticizing him presents a colorable claim under the Civil Rights Act of 1871, 42 U.S.C. § 1983. Two cases—one emanating from the United States Supreme Court and the other from the Court of Appeals for this Circuit—persuade me that it does not. The complaint accordingly will be dismissed.[1]

Taking as true the allegations of the complaint, *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964), and all reasonable inferences deducible therefrom, *Curtis v. Everette,* 489 F.2d 516, 518 (3d Cir. 1973), cert. denied, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974), the operative facts[2] appear to be as follows. Plaintiff Richard A. Sprague was first employed by the City of Philadelphia as an assistant district attorney in February, 1958, and served as first assistant district attorney[3] from June, 1966, through December, 1974. The defendant, F. Emmett Fitzpatrick, was elected district attorney in the November,

1973, general election, and in January, 1974, reaffirmed the designation of plaintiff as first assistant.

Some months later a public controversy arose concerning a series of statements made by the district attorney to the news media regarding the imposition of probation on a criminal defendant whom he allegedly had represented while privately engaged in the practice of law. Essentially, Sprague contends that in these statements Fitzpatrick variously attributed the recommendation of probation to evaluations of the case made by two assistant district attorneys and to an agreement struck by his predecessor and the accused. Sprague further avers he "knew" that defendant's statements were untruthful and when one of the major Philadelphia daily newspapers sought him out asking specific questions concerning Fitzpatrick's comments, he recounted his understanding of how Fitzpatrick had come to recommend probation. The newspaper interview appearing the next day quoted Sprague as disputing *seriatim* Fitzpatrick's prior statements to the news media.[4]

On the day following the publication of plaintiff's newspaper interview, the parties met, at Fitzpatrick's behest, in his office. The outcome of that meeting was defendant's request that Sprague resign, plaintiff's refusal to do so, and defendant's dis-

---

1. By an order dated April 3, 1975, I denied defendant's motion to dismiss plaintiff's amended complaint, see note 5 infra, or in the alternative to require plaintiff to file a more specific complaint. As a result, however, of information revealed in the affidavits made in response to the same order, and in light of the decision of the Court of Appeals for the Third Circuit in *Roseman v. Indiana University of Pennsylvania, at Indiana,* 520 F.2d 1364 (3d Cir. 1975), I exercised my inherent authority to re-examine the propriety of this court's jurisdiction, see, e. g., *Mansfield Coldwater & Lake Michigan Ry. v. Swan,* 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884); *Observa-Dome Laboratories, Inc. v. McGraw-Hill, Inc.,* 343 F.Supp. 1030 (E.D.Pa.1972), ordered reargument on the jurisdictional question, and now conclude that the complaint cannot stand.

2. My order of April 3, 1975, referred to in note 1 supra, directed in part that

each party file one or more affidavits pertaining to the official relationship between them, the facts pertaining to plaintiff's dismissal and any other relevant facts as to whether a valid cause of action exists . . .

3. In his complaint, plaintiff alleges that the designation of first assistant district attorney exists pursuant to the County Code, Act of August 9, 1955, P.L. 323, 16 P.S. § 1421. While this once indeed was correct, the Pennsylvania Constitution was amended in 1961 to abolish all county offices in Philadelphia, including that of the district attorney, and grant all power to the city under its Home Rule Charter Amendment of November 6, 1961, Article XIV, § 8, as amended, Pennsylvania Constitution, Article IX, § 13. See also *Commonwealth ex rel. Specter v. Moak,* 452 Pa. 482, 307 A.2d 884 (1973).

4. See The Philadelphia Inquirer, December 4, 1974, 1A, 14A.

missal of plaintiff from his post effective as of that date.

Plaintiff subsequently instituted this action, alleging that defendant's termination of his employment constituted a violation of his freedom of speech as guaranteed by the First and Fourteenth Amendments and protected by the Civil Rights Act.[5] Although technically this opinion is dispositive of the court's sua sponte inquiry into its subject matter jurisdiction, see note 1, supra, the issue which is ultimately controlling was raised by defendant in each of his motions to dismiss, see note 5, supra.

■ At the outset, I shall discuss briefly why Mr. Fitzpatrick's other arguments are insufficient to justify dismissal of the complaint.[6] Fairly stated, defendant's first contention[7] is that since he was acting as district attorney[8] at the time of the acts

---

5. Defendant moved to dismiss plaintiff's original complaint on the ground that because of the allegation "that defendant had acted solely in his official capacity", Mr. Fitzpatrick was immune from suit and this court lacked jurisdiction over the subject matter. Apparently recognizing that the latter argument at least was not without some merit, see *O'Brien v. Galloway,* 362 F.Supp. 901 (D.Del.1973); cf. *United States ex rel. Gittlemacker v. Philadelphia,* 413 F.2d 84 (3d Cir. 1969), before this court had an opportunity to act upon defendant's motion, plaintiff filed an amended complaint, alleging that defendant's actions occurred "in his individual capacity under color of state law." Defendant thereafter moved to dismiss the amended complaint or in the alternative to require plaintiff to file a more specific complaint, which motion I denied in my aforementioned order of April 3, 1975, see notes 1 and 2, supra.

6. That dismissal of a complaint prior to the reception of any evidence either by affidavits or admission is judicially disfavored seems clear. See *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In this case, however, I not only have had the benefit of the parties' affidavits, but also the carefully researched briefs of counsel and two oral arguments.

7. A curious contention, raised by plaintiff for the first time in his memorandum in opposition to defendant's motion to dismiss the amended complaint is that defendant's attorney, James E. Beasley, Esquire, lacks authority to represent Mr. Fitzpatrick. In support of this remarkable claim, plaintiff cites portions of the Philadelphia Home Rule Charter and a Pennsylvania statute, contending that depending on the status of the district attorney as a city or state official, see note 8 infra, one or the other is applicable. Section 8–410 of the Home Rule Charter provides:

Whenever any officer, department, board or commission shall require legal advice concerning his or its official business or whenever any legal question or dispute arises or litigation is commenced or to be commenced in which any officer, department, board or commission is officially concerned or when-

ever any taxes or other accounts of whatever kind due the City remain overdue and unpaid for a period of ninety days it shall be the duty of such officer, department, board or commission, to refer the same to the Law Department.

\*    \*    \*    \*    \*    \*

And Section 1 of the Act of December 17, 1970, 71 P.S. § 192, states:

It shall be unlawful for any department, other than the Department of the Auditor General, board, commission, or officer of the Commonwealth, to engage any attorney to represent such department, board, commission, or officer, in any matter or thing relating to the public business of such department, board, commission, or officer, without the approval in writing of the Attorney General.

Were I sitting in a state court, or were Pennsylvania law controlling here, it might be necessary to consider this question at some length. In view of my disposition of the case—on the motion of the court, see note 1 supra—I need not decide whether under these circumstances private counsel properly may represent the district attorney.

Another challenge to the motion to dismiss— on the ground that it was filed and served in disregard of the applicable federal and local rules of procedure—was abandoned at the first oral argument.

8. A substantial split of authority exists on the question of whether the Philadelphia district attorney is an official of the city or the Commonwealth. See *Duggan v. 807 Liberty Ave.,* 447 Pa. 281, 288 A.2d 750 (1972); *Commonwealth ex rel. Specter v. Bauer,* 437 Pa. 37, 261 A.2d 573 (1970); *Chalfin v. Specter,* 426 Pa. 464, 233 A.2d 562 (1967); *Commonwealth ex rel. Specter v. Martin,* 426 Pa. 102, 232 A.2d 729 (1967); *Commonwealth ex rel. Specter v. Freed,* 424 Pa. 508, 228 A.2d 382 (1967); see also *Commonwealth ex rel. Specter v. Moak,* 452 Pa. 482, 307 A.2d 884 (1973).

A close reading of these decisions suggests that the status of the Philadelphia district attorney as an official of the city or Commonwealth depends both upon the purpose for which the question is being asked and the composition of the Pennsylvania Supreme Court at the time the question is posed.

alleged in the indictment, he is immune from suit. In *Bauers v. Heisel,* 361 F.2d 581 (3d Cir. 1966), cert. denied, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967), the Court of Appeals for this Circuit held that prosecuting attorneys should enjoy the same immunity as is afforded members of the judiciary.[9] The court hastened to add, however, that the immunity of a prosecutor is not unlimited, but rather extends only to acts he performs within the authority and jurisdiction of his office. 361 F.2d at 590–91. By the time the Court of Appeals decided *Cambist Films, Inc. v. Duggan,* 475 F.2d 887 (3d Cir. 1973), almost seven years after *Bauers v. Heisel,* supra, its views on prosecutorial immunity had been considerably sharpened and refined. In its per curiam opinion in *Cambist Films,* supra, the court stated:

> It is [sic] generally settled principle of law that a district attorney is a "quasi-judicial officer", *Commonwealth, ex rel. Specter v. Martin,* 426 Pa. 102, 232 A.2d 729 (1967), and in the performance of duties imposed on him by law, he cannot be subjected to personal liability through a common law action. Pennsylvania law has [sic], as a general principle, that quasi-judicial officers cannot be subjected to liability, civil or criminal, for any of their judicial acts, no matter how erroneous, so long as they act in good faith. McNair's Petition, 324 Pa. 48, 187 A. 498 (1936). See discussion 63 Am.Jur.2d § 289. Federal courts have similarly held. See *Bauers v. Heisel,* 361 F.2d 581 (3 Cir. 1966). *Cambist* here refers to the language in *Bauers v. Heisel* which implied that not all acts of a district attorney

should be immune. That case stated that " * * * the immunity of a prosecutor, however, is not without limitation; it is not absolute. The immunity of judges, from which immunity of prosecutors is derivative, does not extend to acts which are clearly outside their jurisdiction." This discussion in *Heisel* pertains to cases involving alleged violations of the Civil Rights Act, not common law tort actions. In such cases *Heisel* recognized a distinction that needs be observed between excess of jurisdiction, a circumstance which would not allow liability, as opposed to the clear absence of all jurisdiction over the subject matter, which could result in liability for the judicial official in Civil Rights circumstances. *Robichaud v. Ronan,* 351 F.2d 533 (9 Cir. 1965); *Lewis v. Brautigam,* 227 F.2d 124 (5 Cir. 1955). Even considering the possible civil rights problem here, no liability can be attributed to the prosecutor in our present case because he was not acting where he clearly had no jurisdiction. He was investigating an alleged violation of the laws of Pennsylvania, which was within his powers and duties, and the actions which he proscribed in this instance were such as he felt necessary to the enforcement of those laws. Obviously, this case in no way approaches the "clear absence of jurisdiction" standard required for possible liability on the part of the prosecutor. 475 F.2d at 888–89.[10]

The question here, then, is whether defendant solely by virtue of his status as a quasi-judicial officer, is immune from suit under Section 1983 for his actions in

---

Notwithstanding its inconsistency concerning the status of the office of district attorney in Philadelphia, the Supreme Court of Pennsylvania has unanimously held that all *assistant* district attorneys are employees of the city. See *Commonwealth ex rel. Specter v. Moak,* supra.

9. See also *Bethea v. Reid,* 445 F.2d 1163 (3d Cir. 1971), cert. denied, 404 U.S. 1061, 92 S.Ct. 747, 30 L.Ed.2d 749 (1972); *Cambist Films, Inc. v. Duggan,* 475 F.2d 887 (3d Cir. 1973); *Turack v. Guido,* 464 F.2d 535 (3d Cir. 1972); *United States ex rel. Moore v. Koelzer,* 457 F.2d 892 (3d Cir. 1972).

10. Other courts have perhaps somewhat more jealously guarded the breadth of the immunity with which they are willing to cloak a prosecutor, especially where he strays across the often ill-defined line between quasi-judicial functions and police functions. See, e. g., *Apton v. Wilson,* 165 U.S.App.D.C. 22, 506 F.2d 83 (1974); *Weathers v. Ebert,* 505 F.2d 514 (4th Cir. 1974); *Robichaud v. Ronan,* 351 F.2d 533 (9th Cir. 1973).

the capacity of an employer. I think quite clearly he is not, and I so hold today. The traditional considerations advanced in support of the doctrine of quasi-judicial immunity, see *Bauers v. Heisel,* supra, 361 F.2d at 589–90,[11] do not demand, and the "well-settled proposition that the employment of a public employee may not, in general, be terminated for [the] exercise of constitutionally protected rights," *Leslie v. Philadelphia 1976 Bicentennial Corporation,* 343 F.Supp. 768, 769 (E.D.Pa.1972),[12] will not tolerate the wholesale immunity claimed by defendant.

■■■■■ Defendant's second argument— that the amended complaint should be dismissed for lack of specificity—is devoid of merit. It is, of course, the rule in this circuit that Section 1983 actions must be specifically pleaded in order to withstand a motion to dismiss, *Kauffman v. Moss,* 420 F.2d 1270, 1275 & n.13 (3d Cir.), cert. denied, 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970); *Negrich v. Hohn,* 379 F.2d 213, 215 (3d Cir. 1967),[13] and that broad, conclusory allegations, unsupported by specific factual contentions, are insufficient to state a claim upon which relief may be granted, *id.*[14] It is plain, however, from even a cursory reading of the amended complaint, and from the fact that defendant understood the assertions to such an extent that he was able to identify the decisional authority which support them,[15] that the pleading in question easily satisfies the specificity requirement.

■ The ground upon which I conclude that the complaint must be dismissed was first raised by Mr. Justice Marshall in a footnote in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *Pickering* involved a high school teacher who was discharged for writing a letter to local newspapers in connection with a proposed tax increase. In his letter he had criticized the manner in which the board of education and the district superintendent of schools had handled prior proposals for raising revenue for the schools. *Id.* at 564, 88 S.Ct. at 1732–33, 20 L.Ed.2d at 815. The Court found that some statements in Pickering's letter were true, some although not malicious were false,[16]

---

11. There the court stated:
    [W]e believe that both reason and precedent require that a prosecuting attorney should be granted the same immunity as is afforded members of the judiciary. The reasons are clear: his primary responsibility is essentially judicial—the prosecution of the guilty and the protection of the innocent, *Griffin v. United States,* 295 F. 437, 439–440 (C.A.3, 1924); his office is vested with a vast quantum of discretion which is necessary for the vindication of the public interest. In this respect, it is imperative that he enjoy the same freedom and independence of action as that which is accorded members of the bench. This reasoning is nearly as well established in Anglo-American law as judicial immunity itself [footnote omitted].

12. See, e. g., *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); *Commonwealth of Pennsylvania ex rel. Rafferty v. Philadelphia Psychiatric Center,* 356 F.Supp. 500 (E.D.Pa.1973).

13. See also *Scott v. University of Delaware,* 385 F.Supp. 937, 944 (D.Del.1974); *Salvati v. Dale,* 364 F.Supp. 691, 700 (W.D.Pa.1973); cf. *Pugliano v. Staziak,* 231 F.Supp. 347, 349 (W.D. Pa.1964), aff'd., 345 F.2d 797 (3d Cir. 1965).

14. See also *Scott v. University of Delaware,* supra at 944; *Salvati v. Dale,* supra at 700; *Buszka v. Johnson,* 351 F.Supp. 771, 773 (E.D. Pa.1972); *Mason v. Delaware County,* 331 F.Supp. 1010, 1017 (E.D.Pa.1971); *Johnson v. Kreider,* 264 F.Supp. 188 (M.D.Pa.1967); *Wagner v. Maroney,* 263 F.Supp. 377, 378 (W.D.Pa. 1967).

15. See Memorandum in Support of [defendant's first] Motion to Dismiss, Document No. 5, 4–5.

16. The Court specifically held that absent proof of false statements knowingly and recklessly made by Pickering, his exercise of his right to speak on issues of public importance could not furnish the basis for his dismissal from public employment. *Pickering v. Board of Education,* 391 U.S. 563, 574, 88 S.Ct. 1731, 1738, 20 L.Ed.2d 811, 820 (1968). See also *Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 252, 95 S.Ct. 465, 470, 42 L.Ed.2d 419, 426 (1974); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94

but all fell within the protection of the First Amendment. *Id.* at 572–74, 88 S.Ct. at 1736–38, 20 L.Ed.2d at 819.

With respect to the possible impact of Pickering's letter upon the context of an ongoing employer-employee relationship, the Court stated:

> The statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning.

*Id.* 391 U.S. at 569–70, 88 S.Ct. at 1735, 20 L.Ed.2d at 818. Then, in a footnote pregnant with implications for the case at bar, the court said:

> It is possible to conceive of some positions in public employment in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal. Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them can also be imagined. We intimate no views as to how we would resolve any specific instances of such situations, but merely note that significantly different considerations would be involved in such cases.

*Id.* at 570 n.3, 88 S.Ct. at 1735 n.3, 20 L.Ed.2d at 818. This chord was echoed by Mr. Justice Rehnquist who, writing for the plurality in *Arnett v. Kennedy*, 416 U.S. 134, 160–61, 94 S.Ct. 1633, 1647, 40 L.Ed.2d 15, 37 (1974), cited *Pickering* for the proposition that "in certain situations the discharge of a government employee may be based on his speech without offending guarantees of the First Amendment." [17]

Prior to *Roseman v. Indiana University of Pennsylvania, at Indiana*, 520 F.2d 1364 (3rd Cir. 1975), little had been said in the way of decisional authority concerning precisely what the "significantly different considerations" alluded to in *Pickering* might be. One circuit judge suggested that such factors might include "the need for loyal and sympathetic employees [18] in positions of

---

S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

Defendant has nowhere, either in his affidavit or in the various documents filed by his attorney, characterized plaintiff's statements as made recklessly in disregard of the truth. Rather he has stated that

> [W]hile the subject he chose to comment upon involved a difference of opinion concerning the prosecution of one case, I have little doubt that his open challenge to my authority was intended to enable him to return to the position of unfettered power he enjoyed under the previous administration.

Affidavit in Support of Defendant's Motion to Dismiss Amended Complaint (Document No. 13) 4.

**17.** The factual situation in *Arnett* admittedly was markedly different than that in the case at bar. Kennedy was a nonprobationary federal employee who contended that his dismissal from the Office of Economic Opportunity constituted a denial of due process and an infringement of his right to freedom of speech. In reversing a judgment of a three judge district court for the plaintiff, a plurality of the Supreme Court held, *inter alia,* that the Lloyd-La-Follette Act, 5 U.S.C. § 7501, which authorizes removal or suspension of nonprobationary federal employees "for such cause as will promote the efficiency of the service" is intended to permit dismissal for speech as well as for other conduct. *Arnett v. Kennedy,* 416 U.S. 134, 162, 94 S.Ct. 1633, 1647, 40 L.Ed.2d 15, 37 (1974).

**18.** Neither party has asserted, nor does the record suggest, that plaintiff's was what traditionally has been regarded as a political patronage position, or that his discharge might be termed a patronage dismissal. For a discussion of the considerations which would come into play in the context of a patronage discharge, see, e. g., *Illinois State Employees Un-*

discretion,[19] the need to ensure obedience to state policy, and the need to prevent impropriety or its appearance." *Nunnery v. Barber,* 503 F.2d 1349, 1361 (4th Cir. 1974) (Butzner, J., dissenting).[20]

By far the most instructive pre-*Roseman* case, however, was *Meehan v. Macy,* 129 U.S.App.D.C. 217, 392 F.2d 822, modified, 138 U.S.App.D.C. 38, 425 F.2d 469 (1968), affirmed en banc, 138 U.S.App.D.C. 41, 425 F.2d 472 (1969). Meehan was an employee of the Panama Canal Zone who had been discharged for arranging the printing and distribution of a scurrilous satire of the governor of the Canal Zone and his policies. The court recognized that although a free society values robust, vigorous, and essentially uninhibited public speech by citizens, when such speech by government employees produces intolerable disharmony, inefficiency, dissension, and even chaos, it may be subject to reasonable limitations, at least concerning matters within the duties, discretion and judgment entrusted to the employee involved. 392 F.2d at 833. Then, in an oft-quoted[21] passage epitomizing the pragmatism which all too frequently escapes judicial attention, Judge Leventhal stated:

> We think it is inherent in the employment relationship as a matter of common

sense if not common law that an employee in appellant's circumstances cannot reasonably assert a right to keep his job while at the same time he inveighs against his superiors in public with intemperate and defamatory lampoons. We believe that [an employee] cannot fairly claim that discharge following an attack like that presented by this record comes as an unfair surprise or is so unexpected and uncertain as to chill his freedom to engage in appropriate speech.

*Id.* at 835. I fully agree, and find this reasoning quite apposite to the case at bar.

*Roseman v. Indiana University of Pennsylvania, at Indiana, supra,* represents the first definitive consideration by the Court of Appeals for the Third Circuit of those aspects in *Pickering* germane to this case.[22] Roseman was an associate university professor who alleged that the non-renewal of her contract was at least in part in retaliation for her exercise of protected speech. Specifically, during the period of time in which her renewal was under consideration by the faculty committee on merit and tenure, she involved herself in a controversy concerning the chairmanship of her department. She complained to the dean of the college of arts and sciences that she believed that the acting chairman was wrong-

---

ion Council 34, American Federation of State, County and Municipal Employees, AFL–CIO v. Lewis, 473 F.2d 561 (7th Cir. 1972), cert. denied, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973); Alomar v. Dwyer, 447 F.2d 482 (2d Cir. 1971), cert. denied, 404 U.S. 1020, 92 S.Ct. 683, 30 L.Ed.2d 667 (1972); Nunnery v. Barber, 503 F.2d 1349 (4th Cir. 1974); County & Municipal Employees v. Shapp, 443 Pa. 527, 280 A.2d 375 (1971); Comment, Patronage Dismissals: Constitutional Limits and Political Justifications, 41 U.Chi.L.Rev. 297 (1974).

**19.** A relationship requiring personal loyalty or devotion also was suggested in *Ramsey v. Allen,* 501 F.2d 1090, 1098–99 (10th Cir. 1974).

**20.** *Nunnery* involved the manager of a state operated liquor store, a patronage employee, who contended that her discharge constituted a violation of her civil rights. In affirming the district court's dismissal of the complaint, the court of appeals held since plaintiff had knowingly accepted her position on a patronage basis, her allegation that her discharge was for

patronage purposes in violation of her First Amendment rights failed to state a claim under Section 1983. *Nunnery v. Barber,* 503 F.2d 1349, 1359–60 (4th Cir. 1974).

**21.** Most notably, this passage was quoted with approval in Mr. Justice Rehnquist's opinion for the plurality in *Arnett v. Kennedy,* supra note 16, 416 U.S. at 161–62, 94 S.Ct. at 1648, 40 L.Ed.2d at 37. See also *Fisher v. Walker,* 464 F.2d 1147, 1154 (10th Cir. 1972); *Magri v. Giarrusso,* 379 F.Supp. 353, 358–59 (E.D.La.1974).

**22.** My research reveals that prior to *Roseman,* the only reference by the Court of Appeals for the Third Circuit to that portion of *Pickering* was the statement in *Alderman v. Philadelphia Housing Authority,* 496 F.2d 164, 173–74 (3d Cir. 1974), citing *Pickering* by way of a footnote, that

> We acknowledge . . . that a governmental agency may have a significantly more weighty interest in regulating the speech of its employees than in regulating that of the populace at large . . .

fully suppressing the application of the candidate she favored. The following month, at the invitation of the dean, she repeated these charges at a meeting of the department's teaching staff. One week later, the committee on merit and tenure, of which the acting chairman was a member, decided not to renew her contract, and university officials subsequently ratified that decision.

In its judgment for the defendants the district court rejected Roseman's free speech argument on two grounds. First, the court found that there were adequate work-related reasons for not renewing her contract.[23] Alternatively, the court concluded that her statements to the dean and at the faculty committee meeting were not protected by the First Amendment, and therefore permissibly might form part of the basis for her dismissal.[24] Although the Court of Appeals disagreed with the district court's reasoning on the first ground,[25] it affirmed, on the basis of *Pickering,* supra, the alternative rationale.

In distinguishing *Roseman* from *Pickering,* Judge Van Dusen said:

The communications made by the plaintiff in the case before us differ from Pickering's in two crucial respects. In the first place, Roseman's expressions were essentially private communications in which only members of the Foreign Languages Department and the Dean of the College of Arts and Sciences were shown by the plaintiff to have had any interest. Pickering's letter to the editor, urging the electorate with respect to a pending tax proposal, was, by contrast, a classic example of public communication on an issue of public interest. In *Picker-*

*ing,* as in other cases, the Supreme Court inquired into the public nature of a communication in determining the degree of First Amendment protection. As Roseman's communications were made in forums not open to the general public and concerned an issue of less public interest than Pickering's, the First Amendment interest in their protection is correspondingly reduced.

The second respect in which Roseman's communications differ from Pickering's is in their potentially disruptive impact on the functioning of the Department. Pickering's attacks were on a remote superintendent and school board; in contrast, Roseman's called into question the integrity of the person immediately in charge of running a department which, it is fair to assume, was more intimate than a school district. The district court found that "plaintiff's attacks upon Faust's integrity in a faculty meeting would undoubtedly have the effect of interfering with harmonious relationships with plaintiff's superiors and co-workers." 382 F.Supp. at 1339. In making this finding, the district court reflected a similar concern expressed by the Supreme Court, which noted that Pickering's statements were "in no way directed towards any person with whom [*Pickering*] would normally be in contact in the course of his daily work as a teacher." *Pickering,* supra, 391 U.S. at 569–70 [88 S.Ct. 1731, 20 L.Ed.2d 811]. Because of this, Pickering's case raised "no question of maintaining either discipline by immediate superiors or harmony among co-workers." Id. at 570 [88 S.Ct. 1731, 20 L.Ed.2d 811].

---

**23.** *Roseman v. Hassler,* 382 F.Supp. 1328, 1331–32 (W.D.Pa.1974).

**24.** *Id.* at 1340.

**25.** The district court had held that plaintiff had the burden of proving by a preponderance of the evidence that her non-retention was caused in substantial part by her exercise of the right of freedom of speech. *Id.* at 1339. Relying on *Skehan v. Board of Trustees,* 501 F.2d 31, 39 (3d Cir. 1974), vacated and remanded on other grounds, 421 U.S. 983, 95 S.Ct. 1986, 44

L.Ed.2d 474 (1975), and *Simard v. Board of Education,* 473 F.2d 988, 995 (2d Cir. 1973), the Court of Appeals held that it is insufficient to find that other adequate grounds existed for a plaintiff's dismissal, or even that retaliation did not constitute a substantial part of the reason for his discharge. Rather, a plaintiff "need only prove that the discharge was 'predicated even in part on his exercise of first amendment rights.'" *Roseman v. Indiana University of Pennsylvania, at Indiana,* note 1 supra, 520 F.2d at 1367.

The same obviously cannot be said of Roseman's faculty meeting accusations directed at the Acting Chairman of her Department. [footnote omitted].

520 F.2d at 1368–69. On the basis of those distinctions, the court concluded that Roseman's communications fell outside the protection of the First Amendment, and that therefore the University did not infringe her freedom of speech even if it considered her statements in deciding not to renew her contract.[26]

In terms of the aforementioned criteria, the instant case falls somewhere between *Pickering* and *Roseman*. Plaintiff here, like Pickering but unlike Roseman, aired his views in a forum accessible to the general public, namely a newspaper.[27] As in *Roseman* but not *Pickering,* however, plaintiff's communications here "called into question the integrity of the person immediately in charge," 520 F.2d at 1368, and were "directed toward [a] person with whom [he] would normally be in contact in the course of his daily work," *Pickering,* supra, 391 U.S. at 569–70, 88 S.Ct. at 1735, 20 L.Ed.2d at 818. That plaintiff's statements would interfere with harmonious relationships with his co-workers, and indeed that they have totally precluded any future working relationship between him and the defendant, are beyond question.[28] Indeed, plaintiff himself implicitly concedes this point by his failure to seek relief in the form of reinstatement to his former position.[29]

**26.** The court of appeals affirmed the district court's rejection of Roseman's other allegations, i. e. that her non-renewal violated her right to a pre-termination hearing and penalized her for her religious beliefs. Id. at 1366 n.3.

**27.** I deem as inconsequential the fact that Pickering wrote a letter to the editor of the newspaper, while Mr. Sprague contends that he was sought out by reporters for an interview, see pages 911 & 914 supra.

**28.** Of the relationship between the district attorney and his first assistant, Mr. Sprague stated in his affidavit

. . . the First Assistant District Attorney is the administrative head of the District Attorney's Office, whose job it is to see that the established policies are carried out.

Invariably, District Attorneys use the First Assistant District Attorney for purposes of assistance in formulating policies in the first instance. When a policy has decreed by the Office of the District Attorney, it is the function of the First Assistant to see that the policy is followed.

In the normal operation of the District Attorney's Office in Philadelphia, it is the First Assistant who, in fact, sees to the administration of the Office on a day-to-day basis. There are great numbers of Assistant District Attorneys in various units, each with its own department and its own administrative chief, all of whom report to the First Assistant. It is one of the First Assistant's functions to ensure that each unit is properly administered by the person in charge of that unit and that each one in fact is doing his duty. It is a function of the First Assistant to see that the District Attorney is kept advised as to the functioning of the Office. And, of course, the First Assistant must always be available for consultation in regard to handling investigations and supervising the various work of the Office including, especially, supervision of the prosecutorial work of the Office.

Thus it can be said that the District Attorney sets policy for the District Attorney's Office, that the First Assistant sees that the policies of the District Attorney are carried out and that the day-to-day operations of the Office are handled and carried out in a proper, expeditious fashion. The First Assistant is also an adviser to the District Attorney with regard to suggestions and implementations of various programs within a District Attorney's Office.

Affidavit of Richard Sprague, Document No. 14, 1–2.

**29.** By contrast, the plaintiffs in *Pickering v. Board of Education,* supra; *Acanfora v. Board of Education,* note 32 infra; *Roseman v. Indiana University of Pennsylvania, at Indiana,* supra; *Nunnery v. Barber,* supra; *Skehan v. Board of Trustees,* supra; *O'Brien v. Galloway,* 362 F.Supp. 901 (D.Del.1973); and numerous other cases all sought reinstatement as an avenue of relief.

That plaintiff here did not seek to be reinstated may be owing in part to his serious disagreement with certain policies initiated by defendant, and to what he perceived to be the increasing isolation of his office. Mr. Sprague stated in his affidavit:

In short, Mr. Fitzpatrick permitted the administrative functions of the First Assistant District Attorney to be undermined and, in large measure, rendered nugatory.

In addition, during the same period, Mr. Fitzpatrick, notwithstanding his initial assurances that the advice and counsel of the First Assistant District Attorney would continue to

The question becomes, then, whether the result in *Pickering* or *Roseman* controls where an employee's communications touch upon matters of public concern[30] and are channelled through a public forum,[31] but nevertheless have such a calamitous and disruptive impact as to foreclose any possible effective working relationship between the employee and his immediate superior. I conclude that notwithstanding the public character of plaintiff's statements, *Roseman* is the stronger precedent here. Plaintiff's statements here are strikingly analogous to Roseman's accusations against her acting department chairman and quite unlike Pickering's attacks upon a "remote superintendent and school board." Plaintiff must have known and expected that the inevitable result of his statements—whether they be true or false—would be the abrupt termination of his employment. The practicalities inherent in the superior-subordinate situation presented here dictate that defendant's dismissal of plaintiff not give rise to liability under the Civil Rights Act.

For all the foregoing reasons, then, the complaint will be dismissed.

be sought where policy matters were concerned, progressively excluded the First Assistant District Attorney from policy-making. One example of this aspect of the relationship was in the area of "plea bargaining". Contrary to prior practice—and contrary, in the opinion of your Affiant, to the proper administration of the criminal justice system—Mr. Fitzpatrick decreed that each Assistant District Attorney was free, on an individual case-by-case basis, to enter into any agreement, "deal", or plea bargain that he (the individual Assistant) decided upon without regard to other matters in the Office and without first having consulted with his (the individual Assistant's) superior, or with the First Assistant District Attorney or, indeed, the District Attorney himself.

In my capacity as First Assistant District Attorney, I told Mr. Fitzpatrick that his "system" of plea bargaining was an anarchy. I further opined to Mr. Fitzpatrick that his "system" was not a responsible one in terms of the public trust which attaches to the Office of District Attorney. Nevertheless, Mr. Fitzpatrick continued with this policy of plea bargaining, justifying it in terms of prompt and expeditious disposition of serious criminal matters. Indeed, Mr. Fitzpatrick even rejected my suggestion that Assistant District Attorneys be required, after the fact at the least, to report in writing to him and to me any plea bargain which they had struck. The purpose of the reporting being, obviously, to ensure even-handed justice within the Office and to provide for proper supervision and administration of the Assistants.

In a word, both in terms of administration and in terms of policy making, I was progressively relegated to being First Assistant District Attorney in name only . . .

Affidavit of Richard A. Sprague, note 28 supra, at p. 918.

30. Scandals at all levels of government within the last few years have demonstrated, if nothing else, that the truthfulness of an elected official with the public whose responsibility it is to serve is crucial to the integrity of the democratic process.

31. The Court of Appeals stated in *Roseman*, supra, that had the communications of the plaintiff in that case to the dean and at the faculty meeting been on issues of public interest, or had convinced local news media that her grievance was newsworthy, "entirely different considerations would come into play." 520 F.2d at 1368 n.11. In support of this proposition, the court cites *Acanfora v. Board of Education*, 491 F.2d 498, 500–01 (4th Cir.), cert. denied, 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974). There it was held that a teacher who had been transferred to a non-teaching position when school officials learned that he was a homosexual could grant interviews to the news media with the protection of the First Amendment.

But even in the passage cited in *Roseman* the court says

There is no evidence that the interviews disrupted the school, substantially impaired his capacity as a teacher, or gave the school officials reasonable grounds to forecast that these results would flow from what he said.

491 F.2d at 500–01. And the opinion as a whole leaves no question that the actual or likely impact of a communication upon the employment situation is of paramount importance in considering the propriety of the employer's response to the communication. *Acanfora* is therefore in complete accord with my disposition of the instant suit.